**Alan L. MATHENEY, Appellant (Petitioner Below),**

v.

**STATE of Indiana, Appellee (Respondent Below).**

No. 45S00–9207–PD–584.

Supreme Court of Indiana.

Nov. 24, 1997.

Rehearing Denied March 31, 1998.

---

888

Susan K. Carpenter, Public Defender, J. Jeffreys Merryman, Jr., Steven H. Schutte, Deputy Public Defenders, Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Alan L. Matheney filed a petition for post-conviction relief challenging his conviction and death sentence for the murder of his former wife. Judge Richard J. Conroy denied Matheney's petition, and Matheney appeals. We affirm.

## I. Case History

A jury found that in March 1989 Matheney murdered his ex-wife, Lisa Bianco, while on an eight-hour pass from the Correctional Industrial Complex in Pendleton, Indiana, where he was serving a sentence for battery and confinement in connection with a previous assault on Bianco. Following the jury's recommendation, the court sentenced Matheney to death. This Court affirmed Matheney's conviction and sentence. *Matheney v. State*, 583 N.E.2d 1202 (Ind.1992). This post-conviction proceeding ensued.

## II. Burdens in Post–Conviction Relief

Post-conviction procedures do not afford the convicted an opportunity for a "super appeal." Rather, they create a narrower remedy for subsequent collateral challenges to convictions, challenges which must be based on grounds enumerated in the post-conviction rules. *Weatherford v. State*, 619 N.E.2d 915 (Ind.1993). Petitioners bear the burden of establishing their grounds by a preponderance of the evidence. Ind.Post–Conviction Rule 1, § 5; *Weatherford*, 619 N.E.2d at 917. When appealing the negative

judgment of a post-conviction court, petitioners must show that the evidence, when taken as a whole, "leads unerringly and unmistakably to a conclusion opposite to that reached by the trial court." *Weatherford,* 619 N.E.2d at 917; *Lowe v. State,* 455 N.E.2d 1126 (Ind.1983). If the evidence does not unswervingly point in that direction, the decision of the post-conviction court will stand.

### III. Due Process Claims

Matheney claims that he was denied a full and fair hearing at the post-conviction court because of Matheney's inability to rationally consult with and assist his post-conviction counsel, the court's refusal to provide the names of the jurors at Matheney's original trial so he could investigate the possibility of juror misconduct, the unconstitutionality of the Lake County Magistrate Act which empowered the magistrate who presided in his case, and bias and prejudice on the part of the magistrate hearing the case.

### A. Competency to Proceed with Post–Conviction Petition

■ Matheney's counsel argue that mental illness prevented Matheney from rationally consulting with them, thus depriving him of a fair post-conviction proceeding. Matheney's counsel filed a motion to stay the post-conviction proceedings due to incompetence, and received an opportunity to testify ex parte, with the agreement of the State, as to why they believed Matheney incompetent. After their testimony, the magistrate asked questions of Matheney. He then recessed the hearing to consult with Judge Conroy on the issue of Matheney's competence, and returned with a decision to deny the motion to stay the proceedings. (P.C.R. at 1359–61.)

Counsel presses two arguments on this front: first, whether or not the facts show Matheney "incompetent," or unable to assist his counsel in the preparation of his case and to understand the nature of the post-conviction proceedings; and second, even if he is "incompetent," whether "competence," as that term is understood in cases addressing a defendant's due process rights at trial, *see, e.g., Cooper v. Oklahoma,* 517 U.S. 348, 352–356, 116 S.Ct. 1373, 1376–77, 134 L.Ed.2d 498

(1996), applies to post-conviction proceedings. The post-conviction court found against Matheney on both issues. Because we conclude that Matheney's mental state did not make him unable to proceed, we affirm the trial court's factual finding about competence. We therefore leave for another day the Attorney General's plausible contention that a post-conviction petitioner need only be able to assist counsel sufficiently to permit performance adequate under *Baum v. State,* 533 N.E.2d 1200 (Ind.1989) (holding that postconviction proceedings are not subject to Sixth Amendment or Article I, section 13 guarantees).

The record shows that Matheney believes there to be an organized, systematic conspiracy designed to persecute him, originally spearheaded by his now deceased ex-wife and the prosecutor who tried his criminal battery case. According to his attorneys, Matheney believes this alleged conspiracy to be the only issue relevant to his case, and he will not cooperate with them if he does not find his attorneys' actions or strategic decisions relevant to exposing this conspiracy against him. His counsel and a psychiatrist for the defense claim that Matheney's belief results from a mental disease which causes him to see the world only through a deluded version of reality, namely the conspiracy.

Our review of the record causes us to agree with the post-conviction court's ruling on Matheney's competency. First, Matheney was able to understand the nature of the proceedings against him. Magistrate Page stated,

> The repeated *pro se* criticisms of the attorneys, the courts, and the rulings on the admissibility of evidence, all are in themselves sufficient to support the conclusion that the petitioner has always had a very clear understanding of the nature of the proceedings even if he did not agree with others' opinions of what should be presented in those proceedings.

(P.C.R. at 935–36.) The following colloquy between the magistrate and Matheney supports the court's assessment of Matheney's ability to understand legal strategy and the nature of the proceedings in which he found himself:

Q. Mr. Matheney, do you know who I am?

. . . .

A. Magistrate Page.

Q. And do you know what my function is here?

A. Today you are presiding over this post conviction hearing. . . .

Q. What is a post conviction hearing?

A. The attack of the legalities of your conviction, whether it was legal or illegal, to bring up issues that you feel that a defendant has a right to a new trial or sentence relief or whatever.

. . . .

Q. Your attorneys have filed a Petition for Post Conviction Relief, in which numerous grounds are alleged. Have you had an occasion to read this petition?

A. I read it a couple of times, and I just paid attention to the grounds that pertained to me. There's a lot of stuff in there, statutorily, that they put in everybody's death penalty; and I didn't pay too much attention to, because they've already been ruled on over and over again.

Q. And the doctor said that you felt or seemed to indicate or give the impression that you felt that these issues were frivolous, because the only issue you feel is relevant is the one about [the alleged conspiracy between your wife and the prosecuting attorney at your trial] or this—

A. No. There's a lot of issues in there that I agree with. The only ones that I didn't agree with were the ones that they keep putting in everybody's issue, that the Supreme Court keeps turning down.

. . . .

Q. Well, the general challenges to the death penalty itself?

A. Right, yes.

Q. You feel that those are a waste of time because of the previous rulings of the Supreme Court?

A. Yeah. When I discussed them, they said, well, you never know when you're going to get a new Supreme Court; but a new Supreme Court don't come along often enough in this decade.

Q. Does that seem unreasonable for them to take that position? Have you not seen cases where a court will rule the same way over and over again; and then all of a sudden, along comes the same question and they say, well, now that we think about it, we've changed our mind?

A. Yeah, I've seen cases like that. I just felt that there could have been more issues investigated and put in this than what was.

Q. Your attorneys have suggested that the failure to include additional grounds are a result of you specifically instructing others not to cooperate. Is that the fact of the matter?

A. I believe during this whole thing that they want to investigate my childhood. Well, that has absolutely nothing—what I repeatedly told them, over and over again, is that what you should concentrate on is what had taken place, you know, the death of Lisa Bianco, and what caused it; and we should concentrate on investigating this particular, you know, period of time. Going back to my childhood 30 or 40 years ago, to me, doesn't seem like it's—you know, it's a waste of time, a waste of valuable time. I think time could be better spent on investigating things about the incident itself.

Q. You may not be alone in thinking that. I understand; that argument has been made before.

A. And I also—from what I've read, the courts don't—well, I know the state courts don't put a whole lot of weight on stuff that's, as mitigators, on things that happened 30 or 40 years ago, in my opinion.

(P.C.R. at 1336, 1341–44.) Matheney's responses to the magistrate indicate a clear understanding of the posture of his case and what strategies he and his attorneys sought to employ.

Second, while Matheney may not have cooperated with his lawyers when he disagreed with some of their strategies and may have

been an extremely difficult client, they were able to converse with him and provide an adequate post-conviction review of his conviction and sentence. For instance, counsel claims that Matheney would not cooperate in their attempts to ask him questions about his background for purposes of developing potential mitigating evidence. Matheney's uncooperativeness did not arise from an inability to comprehend the situation or a desire to thwart the attempts of his attorneys at every turn. Rather, based upon his review of case law regarding this type of mitigation evidence, Matheney viewed his attorneys' attempts to investigate his childhood as an inefficient use of his attorneys' already limited time and resources. (*See* P.C.R. at 1343–44.)

Also, Matheney's counsel *were* able to do background research, although they admittedly had a more difficult time than usual in doing so. The following colloquy is illustrative of the situation not being as impossible as counsel suggests:

MR. MERRYMAN: He will not specifically tell us who his friends are, who his associates—with a few exceptions—who his associates are, who we can talk to, to develop his background.

THE COURT: Did you speak with those associates?

MR. MERRYMAN: We spoke with some of them.

THE COURT: Did they tell you who his other associates were?

MR. MERRYMAN: Mr. Matheney didn't—

THE COURT: Yes or no?

MR. MERRYMAN: They told us who they—the other associates were that they knew of.

THE COURT: Okay. Did you speak with, then, those other associates?

MR. MERRYMAN: This was a very small group of people.

. . . .

MR. SCHUTTE: ... [Matheney's] illness prevents [him] either from discussing with us what his childhood was like or from giving his family the freedom they need to discuss it with us.

Now, I will suggest to you his family has been—I will represent to you that I have discussed—I have interviewed his family on numerous occasions. Prior to or following each of those discussions, Mr. Matheney has notified them that under no circumstances are they to communicate with me anymore; because all I'm trying to do, in his view, is the same old thing.

THE COURT: Have they honored those requests?

MR. SCHUTTE: They are under a great burden. I think, frankly, they have been less candid with me than they would like to be ....

(P.C.R. at 1326–27; 1331–32.) While the client may be a very important source of information in counsel's investigation of a capital case, the client is not *the only* source, especially during the lengthy post-conviction process.

■ Given the evidence from Dr. Berkson that Matheney was previously competent to stand trial,[1] (P.C.R. at 2150–51), the evidence available to the post-conviction court about Matheney's present mental state, and the deference we give to a trier of fact's determination of a defendant's or a petitioner's competency,[2] we cannot say that the facts point unswervingly towards a result opposite the one reached by the post-conviction court.

---

1. Although Dr. Jeffrey L. Smalldon, a psychologist testifying for the defense, took strong issue with the opinions of Dr. Berkson and other professionals who evaluated Matheney, *see* (P.C.R. at 1764–66), the trier of fact is not required to believe expert testimony on mental status, *Smith v. State*, 502 N.E.2d 485 (Ind.1987), and could very easily have accepted the opinions of the experts who evaluated Matheney before his trial and have discounted the observations of Dr.

Smalldon after viewing Matheney and engaging him in a series of questions and answers.

2. *Cf. People v. Owens,* 139 Ill.2d 351, 151 Ill.Dec. 522, 527, 564 N.E.2d 1184, 1189 (1990) (post-conviction petitioners may be presumed competent); *Medina v. California,* 505 U.S. 437, 445–52, 112 S.Ct. 2572, 2577–81, 120 L.Ed.2d 353 (1992) (upholding statute allocating burden of establishing incompetency to defendant).

## B. Ability to Interview Jurors

■ Matheney moved the post-conviction court to order the jury commissioner to disclose the names of the jurors and alternates at Matheney's trial, so he could investigate whether the jury had been exposed to any extraneous influences. The court denied Matheney's motion on the grounds that there had been no indication of any outside influences on the jury justifying such an order. The court reasoned that until a petitioner makes an initial showing of a reasonable belief that the jury might have been improperly influenced, the jurors' interests in privacy and repose outweigh a petitioner's interest in uncovering possible improper influences on a jury. (P.C.R. at 1218–19.)

■ While impermissible harm can accrue to defendants when juries are improperly influenced by extraneous information, see, e.g., Wilson v. State, 511 N.E.2d 1014 (Ind. 1987), we agree with the post-conviction court that protection of the jurors' interests in privacy and repose is ample reason to require some hint of a problem before granting a motion to disclose the jurors' names. Cf. Stinson v. State, 262 Ind. 189, 313 N.E.2d 699 (Ind.1974) (affirming denial of request to set aside the jury's verdict supported by juror affidavits claiming impermissible irregularities in deliberation, because an opposite ruling would lead to juror harassment by both sides of litigation resulting in an "unconscionable burden upon citizens who serve on juries").

Matheney's counsel had access to the name of the jury foreperson, as it was a part of the trial court's record. (P.C.R. at 1219.) Indeed, counsel conversed with her regarding any possibility of jury tampering or the receipt of extraneous information by its members and found no evidence of misconduct. (P.C.R. at 1220.) Thus, Matheney had access to other reasonable means of discovering hints of misconduct without the requested order of disclosure. The trial court's ruling was not clearly erroneous.

## C. The Lake County Magistrate Act

■ Matheney claims that Indiana Code § 33–5–29.5–7.1, –7.2 (West 1996), which creates the position that Magistrate Page occupied in this case, violates Article III, Section 1;[3] Article VII, Section 1;[4] and Article VII, Section 4,[5] of Indiana's Constitution. Matheney argues that because all judicial authority rests with the Supreme Court, the legislature cannot create the position of "magistrate" and confer judicial authority upon it. Only the Supreme Court, Matheney argues, has the power to supervise the lower courts, and thus to create magisterial positions when the need arises therein.

These claims remind us of a dispute over legislative and judicial authority in the last century. In 1881 the Supreme Court's docket was overburdened with a backlog of cases two-years deep. To provide relief, the General Assembly passed an act which allowed the Court to appoint five commissioners for two year terms "under such rules and regulations as the Court shall adopt, to aid and assist the Court in the performance of its duties." Act of April 14, 1881, § 1, 1881 Ind. Acts 92, 92; 1 Leander J. Monks, Courts and Lawyers of Indiana 298–99 (1916). The Supreme Court assigned cases to the commissioners, but had final approval over each opinion. Monks, supra, at 299. This arrangement was renewed for another two years in 1883, Act of March 3, 1883, § 1, 1883 Ind. Acts 77, 77, and by 1885 the congestion of the docket was alleviated. See Monks, supra, at 299.

In 1889 the docket was again congested, and "for a second time an appeal was made

---

**3.** "The powers of the Government are divided into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial: and no person, charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided." Ind. Const. art. III, § 1.

**4.** "The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish." Ind. Const. art. VII, § 1.

**5.** "The Supreme Court shall have no original jurisdiction except in ... supervision of the exercise of jurisdiction by the other courts of the State...." Ind. Const. art. VII, § 4.

to the Legislature to provide some relief." *Id.* The legislature passed a bill nearly identical to the 1881 act, but with one important difference: the General Assembly, and not the Court, was to appoint the commissioners. Act of Feb. 22, 1889, § 1, 1889 Ind. Acts 41, 41. The Supreme Court, finding that this modification violated article III, section 1, and article VII, section 1, of Indiana's Constitution, quickly declared the act unconstitutional. *State, ex rel. Hovey v. Noble,* 118 Ind. 350, 21 N.E. 244 (1889).

Magistrates such as Page are not appointed by the legislature or the governor, but by the judiciary, and their appointment is not even mandated, *see* Ind.Code Ann. §§ 33-4-7-1, 33-5-29.5-7.2 (West 1996), unlike the commissioners of the 1881 act. *See* Act of April 14, 1881, § 1, 1881 Ind. Acts ch. 17, § 1, 92, 92. The provisions in the Indiana Code under which Magistrate Page acted merely allowed him to conduct the preliminary proceedings and hearing as a gatherer of facts, but did not allow him to issue a final appealable order. *See* Ind.Code Ann. § 33-4-7-4, -7, -8 (West Supp.1992) (amended 1993). Only Judge Conroy could, and did, (*see* P.C.R. at 945), issue the final appealable order, and did not do so in an uninformed or cavalier manner.[6] We find the magistrate provisions at issue in this case reminiscent of the acceptable legislative assistance provided in the acts of 1881 and 1883, and not the encroachment on the judiciary found in the act of 1889. Accordingly, we hold the magis-

trate act constitutional as it operated in this case.[7]

### D. Magistrate Bias & Prejudice

■ Matheney claims that Magistrate T. Edward Page, to whom Judge Conroy referred the case for hearing, prejudged the facts and was therefore biased against him. He bases this allegation on certain comments made by the magistrate before the hearing. The first occurred in Magistrate Page's own office when he was meeting with Stephen Owens, a deputy public defender, and Kathleen Sullivan, a Lake County prosecutor, about a matter unrelated to Matheney's case. The magistrate's secretary handed him a motion that had just arrived via fax from Matheney's counsel requesting a stay of proceedings because Matheney was allegedly incompetent. Seeing the title of the motion, Magistrate Page stopped his conversation to read it, taking interest in the motion because of its nature and how close its arrival was to the hearing date. He stated that his interest peaked when he came to the affidavit of Dr. Jeffrey Smalldon, a psychologist who supported the motion's allegations. Among other things, Smalldon asserted:

> My opinion that Mr. Matheney is not competent to assist his legal counsel is based on my assessment of his *current* mental status. Although there exists a factual basis for this opinion, I have been advised by Mr. Matheney's legal counsel not to

---

6. The following statement by Magistrate Page illustrates the substantial degree of control maintained by Judge Conroy in this proceeding:

 The Court:

 . . . .

 The procedure followed in this case is that at every stage of these proceedings, Judge Conroy has been involved, if not more, than I have, in terms of reviewing the motions, researching legal issues that have come up. He has called me in from time to time to give me direction on certain points, to draw my attention to certain research. He has certainly read Mr. Matheney's pro se pleadings that have been offered in detail, because he has explained their content to me, more than I have read the motions myself.

 After this hearing is concluded, I will draw up findings, both in discussions with Judge Conroy beforehand and in discussions with Judge Conroy after drafts are made. We will

go over them, back and forth, and before a final decision is made. A final decision will be made by Judge Conroy alone. He will have reference to this tape. He will have reference through [sic] all of the documents that are submitted. . . .

(P.C.R. at 1212–14.)

7. Acting appropriately as a magistrate, Page need not have also been a judge pro tem or a special judge, as Matheney contends. The constitutionality of a similar act involving magistrates was previously challenged in this Court over fifty years ago. The arguments did not surround the power of the legislature to pass such an act, however; rather, the issue was whether or not it was a violation of the constitution to allow judges, and not the governor, to do so. The power of the legislature to create magistrate courts was never questioned. *See Petition for Appointment of Magistrates,* 216 Ind. 417, 24 N.E.2d 773 (Ind.1940).

disclose that basis for purposes of the current affidavit.

(P.C.R. at 279 (emphasis in original).)

"I think any judge faced with making a difficult decision would understand my immediate frustration," the magistrate later stated. "I looked up, and speaking to no one in particular, made the comment, 'I don't believe this,' something to that effect. 'They ask me to find him incompetent, but they don't tell me why.'" (P.C.R. at 1186.) Owens testified that Magistrate Page "said something like, 'I can't believe the arrogance of those people. They want me to find Matheney incompetent but they won't even tell me why they think that.'" (P.C.R. at 377.) [8]

Magistrate Page's remarks show an understandable irritation with a motion that would readily frustrate any trier of fact, one which requests a hearing, but declines to disclose the facts on which the judge might base a decision to grant or deny that request. His remarks do not indicate a prejudgment of the motion, nor do they show bias against Matheney.[9]

 Matheney also claims that Magistrate Page engaged in *ex parte* communication with a potential witness. It appears that Kathleen Sullivan, after receiving a subpoena from Matheney's counsel regarding her presence in the magistrate's chambers when he allegedly made his "injudicious" remarks, reported to the magistrate that he had been accused of making injudicious remarks about death penalty post-conviction relief petitioners, Matheney in particular. If the magistrate replied in any way to Sullivan's statement, (*compare* P.C.R. at 1191 *with* P.C.R. at 1195), it was to ask her if the information she was sharing was privileged. Thereafter, Page immediately contacted both

the State's attorney and Matheney's attorney, pursuant to a prescheduled conference call, and asked whether it was wise for them to continue to hold pretrial meetings without the presence of a court reporter, given what the magistrate had just learned about a potential motion from Matheney's counsel regarding previous out-of-court statements Page had allegedly made. It was at this time that Matheney's counsel informed Page about the contents of affidavits from England and Owens.

Matheney claims that this incident violated Indiana's Code of Judicial Conduct, which states, "A judge shall not initiate, permit, or consider ex parte communications made to the judge outside the presence of the parties, concerning a pending or impending proceeding...." Ind.Judicial Conduct Canon 3(B)(8). We disagree. Magistrate Page did not seek out contact with a witness against Matheney. The "witness" in this instance merely shared with Page what she had heard about the nature of statements the magistrate, himself, had made. Matheney could not reasonably perceive Page as biased merely because the magistrate learned of a motion which Matheney's counsel was about to file against him before it was actually filed. Page immediately made both parties aware of what Sullivan had said to him. No appearance of impropriety or partiality arises from these facts.[10]

 Matheney also alleges that comments made by Magistrate Page at the beginning of the post-conviction hearing, and previously to other judges, show his bias against death penalty litigants in general. The specific statement by Page on which Matheney takes issue is as follows:

[A]llegations of judicial bias and prejudice are, next to accusing a judge of being

---

8. We note that Matheney's counsel submitted an affidavit only from the public defender present concerning what the magistrate allegedly said and did during this particular instance, but did not also submit an affidavit from the Lake County prosecuting attorney who was also present, even though it appears that the latter received a subpoena from Matheney's counsel to provide such testimony. (*See* P.C.R. at 1190–91.)

9. Likewise, Matheney's affidavit from Deputy Public Defender John A. England to the effect that Magistrate Page "left the impression he was not pleased about whatever was in the Matheney pleading," (P.C.R. at 379), does little to show prejudice against Matheney.

10. The same is true of Matheney's complaint about the magistrate's inquiry to Sullivan about whether her possible receipt of a subpoena was a matter subject to rules on confidentiality.

corrupt, are the most serious accusations you can make. They seem to be made casually in these petitions for post conviction relief regarding death penalty cases; and although I was assured by counsel last week, when the subject came up, that, oh, no, these are not routinely made and that they have only made it in this particular instance; and to their knowledge, they're not routinely made in death penalty cases. I find it interesting that in some discussions I had with judges at a conference last Friday, when they asked me how the hearing was going, and I mentioned how the hearing began with it being objected to, that I ought to disqualify myself because I was biased and prejudiced, to my being accused of being biased and prejudiced everytime [sic] I ruled on an objection against the petitioner.... The response from one judge who had handled death penalty PCRs before was, is that he had experienced the same thing. I have heard that from another judge, as well.

(P.C.R. at 1183–84.) We agree with Matheney's characterization of these statements as "mild comments," (Petitioner's Br. at 49). The articulation of observations by one judge to fellow judges concerning what the former perceives to be a trend on the part of defendants or post-conviction petitioners does not indicate bias.

■ Matheney also argues that Magistrate Page denied him a fair hearing by misleading his counsel regarding briefing requirements and then ruling many of his ineffective assistance of counsel claims waived because of either Matheney's failure to provide cogent argument or his failure to plead specific facts in support of his allegations of

error. We have carefully reviewed the facts surrounding this final allegation of bias, finding that either a misunderstanding on the part of Matheney's lawyers or a miscommunication on the magistrate's part, rather than a malicious plot by the magistrate, led to Matheney's inadequate post-conviction brief. We find no bias or prejudice against Matheney on the part of Magistrate Page.

## IV. Ineffective Assistance of Counsel

A litigant who claims he was denied his Sixth Amendment right to effective assistance of counsel must satisfy the standard enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Douglas v. State,* 663 N.E.2d 1153, 1154 (Ind.1996). Under *Strickland,* a defendant must show that his attorney's performance "fell below an objective standard of reasonableness," *id.* (citing *Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66) and "that this substandard performance deprived him of a fair trial," *id.* (citing *Strickland,* 466 U.S. at 691–96, 104 S.Ct. at 2066–69), as determined by whether "there is a reasonable probability that the result of the proceeding would have been different but for the defense counsel's inadequate representation," *Cook v. State,* 675 N.E.2d 687, 692 (Ind.1996). Matheney's evidence on the two prongs of the *Strickland* test must rebut a presumption that counsel's performance was adequate. *Butler v. State,* 658 N.E.2d 72 (Ind.1995).

■ Matheney's claims concerning counsel pertain to both his trial [11] and appellate representation, and they are legion.[12] Judge Conroy found many of these issues waived for failure to provide cogent argument or

**11.** Normally, the failure to challenge trial counsel's ineffectiveness on direct appeal constitutes its waiver from post-conviction consideration. *Spranger v. State,* 650 N.E.2d 1117, 1121 (Ind. 1995) (citing *Hollonquest v. State,* 432 N.E.2d 37, 39 (Ind.1982)).

However, when the same attorney represents a defendant both at trial and on appeal and does not raise on appeal the issue of trial counsel ineffectiveness, we have been reluctant to apply waiver "and thus forever foreclose appellant from raising the question of the competency of his trial counsel." *Spranger,* 650 N.E.2d at 1121 (quoting *Majors v. State,* 441 N.E.2d 1375, 1376 (Ind.1982).) As in

*Spranger,* one of Matheney's trial counsel, Scott L. King, was his sole attorney on appeal. Accordingly, we will follow our prior precedent, *see also Askew v. State,* 500 N.E.2d 1219 (Ind.1986), and review Matheney's post-conviction challenges to the effectiveness of his trial counsel's assistance.

**12.** For example, the post-conviction court listed sixty-one separate ineffective assistance allegations pertaining to appellate counsel alone in its Findings of Fact/Conclusions of Law. (*See* P.C.R. at 892–929.)

failure to plead sufficient facts in support of the allegations. At least some of these allegations are preserved. We have decided, in the interests of judicial economy and because there is a sufficiently developed record, to evaluate the ineffectiveness claim as a whole. Finding all of Matheney's ineffective assistance of counsel allegations unpersuasive, we hold that Matheney was not denied the effective assistance of counsel. Because we also find many of these claims meritless, we will only address some of his stronger arguments for illustration.

### A. Use of Insanity Defense and Mitigating Evidence

Matheney claims his trial counsel pursued a defense during the guilt phase unsupported by the Matheney's mental health evidence, and did not adequately argue during the penalty phase the existence of a mitigating circumstance available from Matheney's mental health evidence. Matheney's argument is summarized as follows. Dr. Morrison, a psychologist who had examined Matheney, was called to testify in support of Matheney's insanity defense. She testified that Matheney suffered from a paranoid personality disorder. To prove insanity, a defendant must show, among other things, that he could not appreciate the wrongfulness of his actions when he committed the crime. Ind.Code § 35–41–3–6 (West 1986). Counsel never attempted to prove that Matheney did not appreciate the wrongfulness of his actions. In fact, Dr. Morrison testified as part of Matheney's post-conviction proceeding that she would have opined at trial that Matheney *could* appreciate the wrongfulness of his actions on the day of the crime. However, she also stated that in her opinion Matheney's illness prevented him from conforming his conduct to the requirements of the law. Such an inability is one of the listed mitigating factors in the death penalty statute. Ind.Code § 35–50–2–9(c)(6) (West Supp.1996). Therefore, Matheney argues, counsel were ineffective for pursuing a defense at the guilt phase on which they had no hope of success, while failing to adequately present readily available mitigating evidence during the penalty phase.

While present counsel bemoan trial counsels' decision to pursue the insanity defense, they provide no evidence of what alternative strategy trial counsel should have employed in its stead. Indeed, there is much to indicate that employing this defense was the best alternative available. There was no available defense that would have cast doubt on the fact that he intentionally killed Lisa Bianco, and by employing the insanity defense, Matheney's attorneys were able to introduce evidence that they otherwise would not have been able to submit. (*See* P.C.R. at 1699 (indicating trial counsels' use of insanity defense to get Matheney's side of the story before the jury through the expert called to testify, while keeping Metheney himself off the witness stand)). We conclude counsel did not perform at a level below professional norms.

Matheney's penalty phase claim of ineffective assistance fails on the prejudice prong. In our opinion concerning Matheney's direct appeal, we addressed the "inability to conform" mitigator, noting evidence supporting the trial court's finding that this mitigator did not exist.[13] Moreover, while trial counsel did not elicit the statement "Matheney's illness prevented him from conforming his behavior to the requirements of the law" from Dr. Morrison, they did elicit testimony from her at the guilt phase which could support the presence of that mitigator. (*See* T.R. at 2724–32.) The trial court informed the jury about the "inability to con-

---

**13.** We stated:

Appellant ... argues that his ability to conform his conduct to the requirements of the law was impaired by his mental disease. However, the defense psychiatrist offered a diseased-mind diagnosis which was rejected by the jury. The facts show that appellant is intelligent and manipulative.

The manner in which appellant prepared for killing Bianco, the way in which he approached Bianco's house, and then carried out the plan indicate that he was not extremely mentally and emotionally disturbed at the time of the murder. Further, appellant had expressed repeatedly an intention to kill Bianco and had tried to solicit others to do so. This evidence supports the trial court's finding that this mitigating circumstance was not present. *Matheney v. State*, 583 N.E.2d 1202, 1209 (Ind. 1992).

form" mitigator, and told the jury it could consider evidence from the guilt phase during the penalty phase. Finally, trial counsel argued this mitigator while arguing to the jury, and to the judge, about sentencing. While eliciting Dr. Morrison's explicit opinion as to the presence of this mitigator during the penalty phase may have helped Matheney, given the testimony elicited from Dr. Morrison, trial counsel's closing argument, and the evidence cutting against the presence of that mitigator already mentioned in our previous opinion, we cannot say that the failure to elicit such testimony from Dr. Morrison creates "a reasonable probability that the result of the proceeding would have been different," *Cook,* 675 N.E.2d at 692.

### B. Failure to Notify the Court about Alleged Incompetency

■ Matheney argues that trial counsel were ineffective for failing to bring Matheney's alleged incompetence to the attention of the court. The post-conviction court found Matheney competent to have stood trial, and thus ruled that his counsel were not ineffective for failing to secure a formal hearing on Matheney's competency.

■ A defendant is not competent to stand trial when he is unable to understand the proceedings and assist in the preparation of his defense. Ind.Code Ann. § 35–36–3–1(a) (West 1986). When making an ineffectiveness claim based upon an attorney's failure to request a competency hearing, an appellate or post-conviction petitioner must cross the performance and prejudice hurdles of the *Strickland* standard. *Dodson v. State,* 502 N.E.2d 1333 (Ind.1987). Matheney's claim does not overcome the first hurdle.

On March 14, 1989, Matheney's trial counsel filed a notice of insanity defense and requested examination by a psychiatrist for determining Matheney's competency to stand trial. On March 27 the trial court appointed Drs. Berkson and Batacan "for the purposes of determining [Matheney's] competency to stand trial and sanity." (T.R. at 7.) Dr. Batacan examined Matheney on April 12 and June 21, 1989, and Dr. Berkson examined

Matheney on April 14, 1989. Neither found the presence of mental disease or defect. Dr. Berkson stated that during his examination Matheney had no difficulty responding promptly to his questions, organizing his thoughts, or putting his thoughts together in a logical, sequential order. Dr. Berkson also testified he had examined Matheney two years earlier in relation to a previous criminal matter and had found Matheney competent at that time.

While trial counsel believed Matheney to be mentally ill, they did not believe it prevented him from understanding the proceedings or from assisting in his own defense. Charles Lahey, one of Matheney's trial counsel, testified, "Despite his obsessive conduct, I didn't find [Matheney] that incapable of planning his own defense. In fact, he was actively planning it although it wasn't right in all regards." (P.C.R. at 1500.) When asked, "In your opinion did Mr. Matheney have a general idea of how the legal system operated and what he was being charged with and the gravity of the situation," Lahey replied, "Yes, I did think that he did." (P.C.R. at 1516.) Asked if he thought Matheney was competent to assist him with the defense, Lahey responded that while Matheney was of little help to them, he did not believe Matheney's lack of help was due to incompetence, as that term is legally understood. (*See id.* at 1542–43.) Philip Skodinski, another of Matheney's trial counsel, when asked if Matheney was competent to assist, replied, "I think he was.... He certainly understood what he was charged with or what evidence [sic] to find he was not guilty. In that regard I guess he was competent to assist in his own defense." (P.C.R. at 1734.)

Given the psychiatrists' determinations before trial, trial counsels' own opinions of Matheney's competency, and Dr. Berkson's earlier determination of Matheney's competency, trial counsel were not ineffective for failing to follow up their request for a determination of competency with a formal motion for a hearing on Matheney's competency.[14]

14. In this same vein, Matheney's appellate counsel would also not be considered ineffective for

failing to raise the issue of Matheney's competency either to stand trial or proceed on appeal.

## C. Failure to Properly Preserve "Fundamental Errors"

■ Matheney claims that both his trial and appellate counsel were ineffective for failing "to properly preserve fundamental errors."[15] (Petitioner's Br. at 87 (capitalization and emphasis excluded).) Specifically, Matheney alleges three errors: first, that appellate counsel was ineffective for failing to argue prosecutorial misconduct on direct appeal; second, that trial counsel, one of whom was also appellate counsel, was ineffective for failing to preserve objections to various alleged errors in the jury instructions and then failing to allege them as fundamental error on appeal; and third, that trial and appellate counsel were ineffective for failing to preserve and/or raise particular claims pertaining to the unconstitutionality of Indiana's death penalty statute at trial and on direct appeal.

### 1. Prosecutorial Misconduct

■ Matheney claims his appellate counsel was ineffective for not raising the issue of prosecutorial misconduct. However, out of the multitude of appellate counsel ineffectiveness claims in his petition for post-conviction relief, Matheney never once makes this claim.[16] The post-conviction court accordingly made no findings on it. (See P.C.R. at 230–45.) The Attorney General contends this issue is waived. The Attorney General is correct. Canaan v. State, 683 N.E.2d 227, 235 (Ind.1997) ("[C]laims not advanced until appellant's brief in an appeal from the denial of post-conviction relief are waived.")[17]

### 2. Jury Instructions

Matheney alleges that one of his trial counsel, who was also his appellate counsel, was ineffective for failing to preserve objections to various errors in the jury instructions and then failing to allege them as fundamental error on appeal. We address these alleged failings below.

■ (a) Burden of Proving Insanity. Matheney claims that various preliminary and guilt phase jury instructions, (see T.R. 577, 611, 620, 632), were erroneous because they placed on him the burden of proving insanity by a preponderance of the evidence. This burden is imposed by Ind.Code Ann. § 35–41–4–1(b) (West 1986). This Court has found this burden constitutional, Price v. State, 274 Ind. 479, 412 N.E.2d 783 (1980), and so has the U.S. Supreme Court, Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952). Thus, Matheney's counsel did not perform below "prevailing professional norms," Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

■ (b) Defendant as "Competent" Witness. Matheney claims trial counsel should have objected to what he says was an instruction commenting on his competence:

> The defendant is a competent witness to testify in his own behalf. He may testify or not, as he may choose. In this case, the defendant has not testified. This fact is not to be considered by the jury as any evidence of guilt. The jury shall not comment upon, refer to, or in any manner

---

**15.** Counsel seems to misunderstand the nature of "fundamental error." If an error is fundamental, then it is so grave that it must be addressed on appeal regardless of whether the issue was otherwise properly "preserved." See, e.g., David v. State, 669 N.E.2d 390, 392 (Ind.1996) ("Where an appellate court finds the error to be fundamental, such error need not be preserved by a contemporaneous objection.... 'To qualify as "fundamental error," the error must be a substantial blatant violation of basic principles rendering the trial unfair to the defendant.'") (quoting Townsend v. State, 632 N.E.2d 727, 730 (Ind. 1994) (citations omitted)).

**16.** Matheney does claim in his petition that his trial counsel was ineffective for failing to object

to the admissibility of this line of questioning on the part of the prosecutor. (P.C.R. at 246–47, 250.) However, Matheney's trial counsel did object to this line of questioning, twice. ( T.R. at 2415–16, 2443–49.)

**17.** Matheney's petition does state, "Matheney was denied the effective assistance of counsel by numerous acts and omissions of appellate counsel. :... Those acts and omissions include, but are not limited to, the following:" (P.C.R. at 230 (emphasis added).) However, this non-committal phrase is insufficient to preserve every conceivable claim of appellate counsel ineffective assistance not mentioned in the petition.

consider the fact that the defendant did not testify in arriving at your verdict in this case.

(T.R. at 630.) According to Matheney, "[i]n common usage, the term 'competent' implies an individual who is sane and free of mental illness." (Petitioner's Br. at 98.) Because the allegation of mental illness was central to his defense and sentence, Matheney argues that either his trial counsel was ineffective for failing to object to this instruction, or his appellate counsel was ineffective for failing to raise the issue on appeal.

■ The post-conviction court correctly interpreted the word in this instance as meaning "legally qualified." (P.C.R. at 914.) The definitions listed for "competent" in Webster's New International Dictionary imply no link to "sanity." Rather, meanings such as "possessed of sufficient aptitude," "possessed of skill needed to perform an indicated action," and "legally qualified in mental and physical makeup <a [competent] witness$" are listed. Webster's Third New International Dictionary 463–64 (1993). Matheney offers no basis for his assumption that a jury would understand "competent" to mean anything other than legally able. Moreover, Matheney's defense went to his sanity *at the time he committed the act.* Even if Matheney was correct, the most the instruction would have done was cause the jury to think Matheney "sane" *at the time of trial.* Thus, he has not shown any evidence of possible prejudice, or of deficient performance on the part of his counsel for not advancing this argument at trial or on appeal.

■ (c) Consideration of Sympathy. Matheney claims that a guilt phase jury instruction which prohibited the jury from considering sympathy for Matheney when reaching a verdict, combined with the jury's instruction to consider all guilt phase evidence at the sentencing phase, amounted to a mandate upon the jury not to consider sympathy at the sentencing phase, absent a limiting instruction to the contrary. Matheney's counsel were not deficient for failing to make this argument, however, in light of our holding that sympathy should not influence a jury's recommendation. *Woods v. State,* 547 N.E.2d 772 (Ind.1989), *on reh.,* 557 N.E.2d 1325 (1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2911, 115 L.Ed.2d 1074 (1991).

■ (d) "Lying in Wait" Instruction. The trial court gave the following instruction to the jury:

"Lying in wait" requires watching, waiting, and concealment from the person killed with the intent to kill that person.

"Lying in wait" means taking the victim by surprise or ambush. The lying in wait need not last for any particular period of time provided that the length of time is sufficient to allow the defendant to form the intent to kill.

Concealment from the victim must be the direct means to attack or gain control of the victim. It is not necessary, however, that the defendant be concealed when the fatal acts are committed as long as the lethal attack begins and flows continuously from the moment the concealment and waiting ends.

(T.R. at 669; P.C.R. at 915.) This instruction is a correct statement of Indiana law. *See Davis v. State,* 477 N.E.2d 889 (Ind. 1985), *cert. denied,* 474 U.S. 1014, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). While "lying in wait" is not defined in the criminal code, this Court's definition of it in *Davis* and subsequent cases gives the phrase sufficient specificity to survive a vagueness challenge. As for this aggravator's ability to narrow the class of death-eligible murderers, *Davis* indicates that not all those convicted of murder would necessarily fall within this aggravator's definition. *See id.* at 897 (finding insufficient evidence to support the trial court's finding of murder committed while lying in wait). No reasonable lawyer would think it necessary to challenge the lying in wait aggravator on its face or as applied in this case, given our cases dealing with this issue.

■ (e) Instruction Containing All Statutory Mitigators. Matheney claims that the trial court erred by giving penalty phase instruction six, which placed all eight statutory mitigators before the jury and did not instruct the jury that it must consider mitigation. Several of the mitigators were not relevant to the evidence presented in his

case. Therefore, Matheney argues, he was prejudiced by this instruction because it trivialized the evidence which he did present and possibly encouraged the jury to view the absence of one of the listed mitigators as an aggravating circumstance in and of itself. We have rejected this argument, *Miller v. State,* 623 N.E.2d 403 (Ind.1993), and thus do not view Matheney's counsel were ineffective for not making it.

 Matheney also asserts that the trial court erred in instructing the jury, "The mitigating circumstances that *may* be consider under this section are as follows," (T.R. at 670), claiming that the jury *must* consider mitigation. The "may" in the court's instruction does not go to the consideration of mitigation generally, but to the notion that the jury *was permitted to consider any one or more of* the following list, including the "catch-all" at the end. Given final instruction ten, which states, "You are to consider both aggravating and mitigating circumstances," (T.R. at 674), we have no reason to believe that the jury misunderstood the correct interpretation of "may" in instruction six. Because instruction six was a correct statement of the law, Matheney's counsel were not ineffective for failing to raise the arguments proffered here.

 (f) Consideration of Guilt Phase Evidence at Penalty Phase. Matheney argues that either his trial or appellate counsel were ineffective for failing to challenge the trial court's instruction of the jury to consider all guilt phase evidence at the penalty phase. (*See, e.g., id.*) Because we have previously approved the incorporation of all the trial evidence for penalty phase consideration, *see, e.g., Smith v. State,* 475 N.E.2d 1139 (Ind. 1985), Matheney's counsel were not ineffective for failing to raise the argument advanced here.

 (g) Unanimity and Burden of Proof for Mitigators. Matheney claims the

penalty phase final instructions were inadequate in that: (1) they failed to state that the jury did not need to find a mitigating factor unanimously in order to consider it; and (2) they failed to state that mitigating circumstances need only be proven by a preponderance.

As to Matheney's first contention, this Court has already resolved it against him. *Bivins v. State,* 642 N.E.2d 928 (Ind.1994). Thus, Matheney's counsel were not ineffective for failing to make the argument proffered here.

As to Matheney's second contention, it is true that "preponderance of the evidence" is the appropriate standard for determining mitigating circumstances. *Id.* at 950 (citing *Rouster v. State,* 600 N.E.2d 1342, 1348 (Ind. 1992)). An instruction to that effect would have been appropriate. Nevertheless, the absence of an instruction so stating, without more, does not necessarily suggest to jurors that mitigating circumstances need be proven beyond a reasonable doubt, as Matheney contends. Matheney's argument was questioned in *Miller v. State,* 623 N.E.2d 403, 409–10 (Ind.1993), and we formally reject it today. As we noted in *Miller,* "All instructions to a jury on reasonable doubt place that burden upon the State. There is no inference in any portion of a trial that a defendant's evidence comes under that scrutiny." *Id.* at 409. Without something specific in the given jury instructions which would clearly lead a jury to such a misunderstanding, a bald assertion as to what a jury is likely to presume will not suffice.

 (h) Penalty Phase Final Instruction Twelve. Matheney alleges that penalty phase final instruction twelve [18] gave the jury incomplete and misleading information about the penalties available for Matheney if he was not sentenced to death. Specifically, Matheney argues that the court: (1) did not inform the jury of the available penalties for

---

**18.** Penalty phase final instruction twelve states:
 In the State of Indiana, if the death penalty is not imposed, the sentence for murder is a fixed sentence of from thirty (30) to sixty (60) years. The presumptive penalty is forty (40) years. The Court at sentencing imposes a specific number of years within that range.

In the State of Indiana, a defendant can earn credit for good behavior to apply against the sentence, with a maximum allowable credit of fifty percent [sic] (50%) of the sentence imposed by the Court.
(T.R. at 676.)

burglary; (2) did not define or explain "presumptive" or "credit time [sic] for good behavior"; (3) did not discuss or explain the possibility of consecutive sentences; and (4) did not discuss the grounds for imposing an aggravated term. Basing his claim on *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), where Matheney claims to find a due process requirement that juries "be correctly instructed about the sentencing alternatives available in lieu of a death sentence," (Petitioner's Br. at 104), Matheney argues that this instruction and the stated omissions misled the jury by leaving them with "the impression that, should the jury decline to impose death, Matheney could be released after serving fifteen years." (Petitioner's Br. at 104.)[19]

 The instruction was a correct statement of the law at the time of Matheney's trial. Counsel's failure to request instruction on the penalty for burglary, or the attendant instructions regarding consecutive sentences and aggravated terms, did not make them ineffective. An attorney may reasonably desire not to remind a jury deliberating a death sentence that the defendant was found guilty of another serious felony in addition to murder. Also, *Simmons* was handed down more than two years *after* we decided Matheney's case on direct appeal, and four years after his trial. Because *Simmons* was not available to Matheney's trial or appellate counsel, it cannot be said that either were ineffective for failing to make a claim based upon its holding, even if what Matheney claims to be *Simmons* holding is correct.[20]

 Also, we cannot say that the terms "presumptive penalty" and "credit for good behavior" are such technical terms of art that a layman could not understand them. *See McNary v. State*, 428 N.E.2d 1248, 1252 (Ind. 1981). Therefore, Matheney's counsel were not deficient for failing to request clarification, nor has Matheney shown any prejudice so as to undermine confidence in the outcome of his trial.

*3. Constitutionality of Indiana's Statute*

Matheney alleges that his trial counsel were ineffective for failing to preserve numerous constitutional objections to the Indiana death penalty statute. Matheney concedes that we have rejected many of his constitutional challenges, (Petitioner's Br. at 106); counsel appear to offer them in contemplation of federal appeal, (*see id.*), though many of these have also been rejected in courts of the United States. For those constitutional challenges already decided adversely to Matheney's claims, this Court "does not choose to reassess its position at this time." *Daniels v. State*, 528 N.E.2d 775, 783 (Ind.1988). Even if we did so choose, however, it would be highly unlikely that we would find prior counsel's performance substandard for failing to make these challenges, considering we have already spoken to the contrary concerning them. Accordingly, we will address here the alleged failings of prior counsel as to constitutional challenges not already addressed adversely to Matheney by

---

**19.** Counsel's brief leaves its own impression, saying, "Matheney was prejudiced by this instruction; *studies* show that the amount of time the jury believes a defendant will actually serve is a very important factor in deciding whether to recommend the death penalty. *Simmons v. South Carolina* [512 U.S. at 159], 114 S.Ct. at 2191." (Petitioner's Br. at 104 (emphasis added).) Review of *Simmons* at that citation, however, shows much less than Matheney's statement would have us believe. Instead of there being multiple "studies," there was a single public opinion survey. Instead of it being representative of juries in general (and, thus, relevant here), the sample pool was limited exclusively to South Carolinians qualified for jury duty. *See* Ind.Professional Conduct Rule 3.3 cmt. *Misleading Legal Argument.*

**20.** Contrary to Matheney's assertions, this case does not hold that due process requires a jury to be correctly instructed about sentencing alternatives available in lieu of a death sentence. Neither does it imply that the fear of a defendant "getting out" after a term of years inherently influences a jury's death sentence deliberation. *Simmons* specifically deals only with a capital defendant's ability to rebut assertions of future dangerousness when the State has argued that issue before the jury, a situation where "the actual duration of the defendant's prison sentence is indisputably relevant." *Simmons*, 512 U.S. at 163, 114 S.Ct. at 2194.

this Court.[21]

██ (a) Finding of Probable Cause for Capital Trial Eligibility. Matheney says counsel should have argued that Indiana Code § 35–50–2–9(a) violates the United States[22] and Indiana[23] Constitutions facially and as applied because it allows a defendant to be subjected to a "death-qualified" jury without first having a neutral fact-finder determine, after an adversarial proceeding, probable cause for death eligibility. According to present counsel, studies show death-qualified juries to be more likely to vote for conviction than non-death qualified juries. Because prosecutors have discretion to seek the death penalty, Matheney argues that they can impermissibly use their discretion to impanel death-qualified juries just to increase their chances of securing a conviction in close cases or of having a jury which is more prosecution-oriented.[24]

██ As Matheney concedes, however, the U.S. Supreme Court has held the use of "death-qualified" juries to be constitutional. *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). In so doing, that court referred to death-qualified juries as "impartial." *Id.* at 180, 106 S.Ct. at 1768.

In light of this suggestion, Matheney's counsel was not ineffective for failing to claim otherwise.[25]

██ (b) The "Felony/Murder" Aggravator. Matheney claims that the "felony/murder aggravator" in the death penalty statute violates the U.S. and Indiana Constitutions facially and as applied because it is vague, overbroad, and fails to narrow meaningfully the class of death-eligible murderers.[26] Indiana Code § 35–50–2–9(b)(1) provides:

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

Ind.Code Ann. § 35–50–2–9(b)(1) (West Supp.1989) (amended 1993).

Matheney claims that the phrase "while committing or attempting to commit" is vague, violating *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954) (stating that criminal codes must "give a person of ordinary intelligence fair notice

**21.** It is apparent that Matheney has little interest in these contentions. *See* colloquy quoted *supra* part III.A. Present counsel present them as free-standing constitutional challenges, but they are not available to him except as they reflect on the performance of prior counsel.

**22.** Specifically, its Fifth, Sixth, Eighth, and Fourteenth Amendments.

**23.** Specifically, Article 1, Sections Twelve, Thirteen, Fourteen, Sixteen, and Twenty-three.

**24.** Although Matheney claims that this potential for "prosecutorial abuse" violates many provisions of both the U.S. and Indiana Constitutions, he fails to allege any violation other than denial of the right to an impartial jury. (*See* Petitioner's Br. at 107–08.) Accordingly, any other violations arising from this potential for alleged abuse are waived.

**25.** Although Matheney makes an "as applied" challenge, he fails to allege any facts tending to show that the prosecutor in his case used his power to achieve the ends called impermissible by Matheney. Thus, Matheney's contention that his trial counsel was ineffective for failing to

make this "as applied" claim is waived. Ind.Appellate Rule 8.3(A)(7); *cf. Armstead v. State,* 538 N.E.2d 943, 945 (Ind.1989) (finding appellant's contention waived on appeal for failure to support claim with cogent argument or facts from the record).

**26.** Matheney also claims that our death penalty statute violates United States and Indiana constitutional prohibitions against double jeopardy. However, his convoluted arguments appear to be premised upon the notion that Matheney was convicted of felony murder. (*See* Petitioner's Br. at 110–11.) Because Matheney was charged and convicted of intentional murder, Ind.Code Ann. § 35–42–1–1(1) (West 1986), and not felony murder, *id.* § 35–42–1–1(2) (West Supp.1989) (amended 1989, 1993), (T.R. at 12), he has no standing to make this argument. *Minnick v. State,* 544 N.E.2d 471, 476 (Ind.1989); *Fleenor v. State,* 514 N.E.2d 80, 92 (Ind.1987). Therefore, Matheney's trial counsel was not ineffective for failing to make a claim that he lacked standing to make. To the extent that Matheney claims a double jeopardy violation premised upon intentional murder and the felony murder aggravator, his claim is waived for lack of cogent argument, Ind.Appellate Rule 8.3(A)(7). *Armstead,* 538 N.E.2d at 945.

that his contemplated conduct is forbidden"). (Petitioner's Br. at 109). Other than this bald assertion, however, Matheney provides no evidence or argument as to how a person of ordinary intelligence would fail understand what it means. Without more, he offers little grounds for the claim that his attorneys were ineffective for failing to make this meritless claim.

▪ Matheney also claims that Ind. Code § 35–50–2–9(b)(1) is "overbroad," because "the majority of homicides are committed in conjunction with another crime. *See Broadrick v. Oklahoma,* 413 U.S. 601, 612 [93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830] (1972)." (Petitioner's Br. at 109.) Matheney's overbreadth argument, however, is confused and misplaced. Overbreadth is a constitutional doctrine primarily applied in the First Amendment context. It is designed to protect innocent persons from having the legitimate exercise of their constitutionally protected freedoms fall within the ambit of a statute written more broadly than needed to proscribe illegitimate and unprotected conduct. *See Broadrick,* 413 U.S. at 612, 93 S.Ct. at 2915–16; Laurence H. Tribe, American Constitutional Law § 12–27 (2nd ed.1988). Matheney makes no argument as to what legitimate conduct might possibly fall within the felony murder aggravator, nor could he.

▪ Matheney also claims that Indiana Code § 35–50–2–9(b)(1) violates *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), by failing to narrow meaningfully the class of murderers eligible for the death penalty. Besides this assertion, the only argument Matheney makes is that "the majority of homicides are committed in conjunction with another crime." (Petitioner's Br. at 109.) Matheney's argument fails for at least two reasons. First, he provides no authority for his proposition that a majority of homicides are committed in conjunction with other crimes. We would be very reluctant to find a statute, which enters our courtroom "clothed with a presumption of constitutionality," *Sidle v. Majors,* 264 Ind. 206, 209, 341 N.E.2d 763, 766 (Ind.1976), unconstitutional on a single, unsupported assertion of fact. Second, even if it were true

that a majority of homicides are committed in conjunction with another crime, this has no specific relevance to the aggravator at issue here, which does not make "the commission of any other crime" an aggravating circumstance, but only the commission of certain enumerated felonies. We are unable to find Matheney's original lawyers ineffective for failing to make this claim.

(c) The "Lying in Wait" Aggravator. Matheney argues that the lying in wait aggravator, Ind.Code Ann. § 35–50–2–9(b)(3) (West Supp.1996), is facially vague, and vague and overbroad as applied. We begin by rejecting his overbreadth challenge here for the same reason we rejected it above pertaining to the felony murder aggravator. *See supra* part IV.C.3(b). Next we note that we have already rejected Matheney's ineffective assistance claim regarding a challenge to the jury instructions given regarding this aggravator. *See supra* part IV.C.2(d). For the reasons set forth there, we reject his repeated "as applied" challenges here.

Finally, Matheney challenges our interpretation of the lying in wait aggravator as applied in our direct appeal opinion of his case, arguing that under the language we used in summing up the facts in support of our affirmance, "the lying in wait aggravator could apply to virtually any intentional killing." (Petitioner's Br. at 111.) Actually, appellate counsel argued the meaning of this statute with sufficient persuasion that it drew a dissent on this very point. *Matheney,* 583 N.E.2d at 1209 (DeBruler, J., concurring and dissenting). Counsel did not carry the day, but was hardly ineffective.

▪ (d) Aggravation Contentions. Matheney claims that Indiana Code § 35–50–2–9(b), which sets out the aggravating circumstances that justify the imposition of the death penalty in Indiana, violates the Eighth and Fourteenth Amendments of the U.S. Constitution, and Article One, Section Sixteen, of the Indiana Constitution. He says the statute fails to state specifically that only charged aggravators may be considered by the sentencer, thus allowing, by omission, the sentencer to consider uncharged and invalid aggravating circumstances.

In support of his federal constitutional claim, Matheney cites *Espinosa v. Florida*, 505 U.S. 1079, 1081, 112 S.Ct. 2926, 2928, 120 L.Ed.2d 854 (1992) (per curiam). *Espinosa* does state that "the weighing of an invalid aggravating circumstance violates the Eighth Amendment," *id.* (citations omitted), and does find the aggravator at issue in the case[27] invalid. However, as we have observed, *Espinosa* and similar federal cases

> focus upon vagueness, not upon whether the aggravators used were among those prescribed by the applicable death penalty statute; they therefore do not appear to suggest that non-statutory aggravating circumstances are necessarily invalid. To the contrary, once statutory aggravating circumstances have circumscribed the class of persons eligible for the death penalty, the federal Constitution does not require the sentencer to ignore other possible aggravating circumstances to the extent authorized in a state's capital sentencing statute. *Zant v. Stephens* (1983), 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235.

*Bivins v. State*, 642 N.E.2d 928, 954–55 (Ind. 1994). Based on this assessment, we held in *Bivins* that a trial court's consideration of non-statutory aggravating circumstances did not violate the Eighth Amendment. *Id.* at 955.

In support of his state constitutional claim, Matheney cites *Bivins*, 642 N.E.2d 928, where we held that consideration of nonstatutory aggravating circumstances violates Article One, Section Sixteen, of the Indiana Constitution. *Id.* at 955–57. In *Bivins*, the trial court considered victim impact evidence

and did not distinguish its findings as to the death penalty from those relating to the sentences imposed for non-capital felony convictions. *See id.* at 953–55.

In Matheney's trial, the jury instructions clearly informed the jury that it could only consider the charged (and valid) aggravators.[28] The trial court specifically mentioned only the two charged aggravators in its sentencing statement. (*Id.* at 701–02.) Thus, the fact that Indiana Code § 35–50–2–9(b) does not specifically state that "only listed aggravators may be considered" is irrelevant, because Matheney's sentencer clearly considered only valid aggravators. Accordingly, Matheney's trial counsel were not ineffective for failing to make the assertion he advances here.

(e) Mitigation Contentions. Matheney makes various arguments for why Indiana Code § 35–50–2–9(c), which specifies the mitigating circumstances a sentencer is to consider at the penalty phase of a capital trial, violates the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article One, Sections Twelve, Thirteen, and Sixteen of Indiana's constitution.[29]

The opening sentence of the section states, "The mitigating circumstances that *may* be considered under this section are as follows:. . . ." Ind.Code Ann. § 35–50–2–9(c) (West Supp.1996) (emphasis added). Citing federal precedent holding that a sentencer may not refuse to consider or be precluded from considering mitigating evidence, Matheney claims that the term "may" makes the consideration of mitigating evidence optional,

---

**27.** The trial court in *Espinosa* instructed the jury that a potential aggravating circumstance it could find was that the murder was " 'especially wicked, evil, atrocious or cruel.' " *Espinosa*, 505 U.S. at 1080, 112 S.Ct. at 2927 (quoting Fla.Stat. § 921.141(5)(h)).

**28.** The jury was instructed that the State could seek the death penalty by charging that the defendant committed murder either by "intentionally killing the victim while committing burglary," or "by lying in wait." (T.R. at 666.) The jury was then instructed that "the burden is upon the State to prove to you beyond a reasonable doubt the aggravating circumstance set forth in the charging information wherein the State is

seeking the death penalty." (*Id.* at 671.) The jury was then instructed that "[i]f the State failed to prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances, you shall not recommend the death penalty." (*Id.* at 674.)

**29.** Although Matheney cites these provisions in his heading, he rarely provides separate legal analysis concerning Indiana Code § 35–50–2–9(c) and these Indiana constitutional sections. Accordingly, except for those arguments specifically providing such separate legal analysis, these claims are waived. *Tobias v. State*, 666 N.E.2d 68, 72 n. 1 (Ind.1996); *St. John v. State*, 523 N.E.2d 1353, 1355 (Ind.1988).

thus allowing the sentencer to refuse to consider mitigating evidence. We disagree. The term "may" in this sentence simply means that any one of the listed mitigators following that sentence are permissible for consideration, including the "catch-all" provision which states, "Any other circumstances appropriate for consideration." *Id.; see supra* part IV.C.2(e). This interpretation is the more reasonable one, particularly when viewed in light of § 35–50–2–9(e)(2),[30] which requires a jury, before it can recommend death, to consider any existing mitigating evidence in order to find it outweighed by the charged aggravator(s). Because the code section at issue, when read in the light of the other relevant sections, does not make the consideration of mitigation optional, Matheney's trial counsel was not ineffective for failing to make the argument advanced here.

■ Matheney says counsel should have argued that Ind.Code § 35–50–2–9(c) sets up barriers to the consideration of mitigating evidence in a capital case, first, by failing to specify that the only prerequisite to considering mitigating evidence is its relevance to the defendant's character, record, or the circumstances of the crime, and, second, by failing to provide any standard of proof. As to his first claim, Matheney fails to provide any insight into why the absence of such a specification would prevent a sentencer from considering otherwise relevant mitigating evidence. Thus, this claim is waived for failing to present any cogent argument in support of it. *Armstead,* 538 N.E.2d at 945. As to his second claim, we reject it for the reasons stated previously in part IV.C.2(g).

■ Matheney also claims that Indiana Code § 35–50–2–9(c) is unconstitutional because it fails to provide an adequate definition of "mitigation." The entire support Matheney provides for this contention, however, is as follows:

The Supreme Court of Indiana has noted that "mitigating circumstances ... include virtually anything favorable to the

accused." *Smith v. State,* 547 N.E.2d 817, 822 (Ind.1989). This definition of mitigation is not within the common understanding of the average juror. *Canfield v. Sandock,* 563 N.E.2d 1279, 1283 (Ind.1990) (technical and legal phrases used in instructions should be defined).

(Petitioner's Br. at 115–16.) We think the breadth of this definition and the ordinary understanding of the word "mitigating" is such that counsel who elected not to make the present contention were acting within the scope of the Sixth Amendment promise of effective counsel.

■ Matheney also argues that the mitigating circumstance "no significant history of prior criminal conduct," Ind.Code Ann. § 35–50–2–9(c)(1) (West Supp.1996), is unconstitutional because the adjective "significant" creates "an unacceptable risk that the sentencer will view the defendant's record in terms of aggravation only, thereby converting the absence of a mitigator into an aggravator." (Petitioner's Br. at 116.) We see no reason to assume that juries would make such a leap. Matheney's earlier lawyers did not fail their client by taking a pass on this contention.

■ Matheney also argues that the mitigator "The defendant was less than eighteen (18) years of age at the time the murder was committed," § 35–50–2–9(c)(7), is unconstitutional because it considers only chronological age, rather than also considering the defendant's emotional and intellectual age. Matheney's only support for this proposition, however, is a single sentence: "These are more accurate indicators of culpability than chronological age. *See Lockett, supra.*" (Petitioner's Br. at 117.) This argument is deficient for several reasons. First, it cites *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), for its proposition that emotional and intellectual age are more accurate indicators of culpability than chronological age. Not only is *"See Lockett, supra,"* without more, an entirely inadequate citation

---

**30.** "The jury may recommend the death penalty only if it finds: ... (2) that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Ind. Code Ann. § 35–50–2–9(e)(2) (West Supp.1989)

(amended 1993). Section 35–50–2–9(g)(2) makes the same mandate upon the court, if the hearing is to the court alone. *Id.* § 35–50–2–9(g)(2). These two sections are currently reflected in § 35–50–2–9(k) (West Supp.1996).

of authority, but we can find nothing in *Lockett* which remotely suggests that "intellectual" or "emotional" age (whatever those may mean) are better indicators of culpability than chronological age.[31] Second, even if "intellectual" or "emotional" age is something that should be considered in a particular defendant's case, such evidence could be introduced and argued under the "catch-all" mitigator. We cannot see how Matheney's counsel were ineffective for failing to make the claim advanced here.

## V. Trial Court's Pre–Sentence Psychological Questionnaire

After this case was fully briefed, Matheney's counsel learned that Judge James Letsinger, who sentenced Matheney to death, had regularly caused the probation department to administer a pre-sentence questionnaire to all defendants sentenced in his court. Matheney moved to hold his appeal in abeyance so he could return to post-conviction court for discovery and litigation regarding whether Judge Letsinger had used the questionnaire in sentencing him and, if so, whether that use violated *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). This Court perceived the need for more information, so we directed Judge Letsinger to answer certain questions in regards to this issue.[32] After receiving Judge Letsinger's answers, we directed Matheney to submit a supplemental brief addressing any substantive and/or procedural claims he might have regarding the questionnaire.

The details surrounding this issue show that Matheney did fill out Judge Letsinger's questionnaire, the questions of which were adapted from the Minnesota Multiphasic Personality Inventory, or "MMPI."[33] Whether a copy of this completed questionnaire was provided to Matheney's counsel, however, is open to doubt. Judge Letsinger states that he has used this questionnaire with every defendant whom he has sentenced since at least 1979, and claims that it has always been attached to the presentence investigation report submitted to the defendant prior to sentencing. (Petitioner's Supp. Br. at A–32, A–54.) Matheney's trial counsel states that although he was generally familiar with Judge Letsinger's questionnaire, he does not specifically remember if it was attached to Matheney's presentence report. He claims, however, that if it had been attached, it would still be there, because he would not have removed it. (*Id.* at A–59.)

Matheney also presents an affidavit from another attorney who has practiced in Judge Letsinger's court who received a presentence

---

**31.** In fact, the plurality opinion seems to indicate that chronological age *is* something that should generally be considered in mitigation. *See Lockett*, 438 U.S. at 608, 98 S.Ct. at 2967 (complaining that under Ohio's mitigation scheme, "consideration of a defendant's comparatively minor role in the offense, *or age*, would generally not be permitted, as such, to affect the sentencing decision") (emphasis added).

Also, factors which assess a defendant's degree of "culpability" are for the legislature, not the judiciary, to determine. Unless a statutorily created aggravating circumstance violates some constitutional right of a defendant, we are not the proper forum for determining what aggravating circumstances are or are not "appropriate."

**32.** The questions of Judge Letsinger and his corresponding, answers relevant to our opinion are as follows:

Question 1: Did you review a questionnaire that was completed by Alan Matheney in connection with Lake Superior Cause No. 45G02–9001–CF–22?
Answer: Yes.
. . . .

Question 3: Did you rely on Matheney's responses to the questionnaire when sentencing him? If so, please explain.
Answer: It is difficult to reproduce thought processes which are over six (6) years old. I do not think I relied on any one answer or series of answers. If I had relied on any answer in the questionnaire, I would have specifically noted the same in my written findings. There was no such notation.
. . . .

Question 5: Was a copy of the completed questionnaire (sic) to Matheney or his counsel? If so, please state when and to whom.
Answer: Yes. The questionnaire is an exhibit to the pre-sentence investigation report. Whenever counsel for the defendant received his copy of the pre-sentence, which is usually one (1) or two (2) days before sentencing, he got a copy of the questionnaire.
(Petitioner's Supp. Br. at A–53, A–54.)

**33.** The questionnaire is three pages long. It asks for yes or no answers to various questions, such as "I seem to be about as capable as most others around me." (*See* Appendix to Appellant's Supp. Br. at A–55—A–57.)

investigation report on his client that did not have a psychological evaluation questionnaire attached to it. (*Id.* at A60.) Finally, Matheney presents the deposition of Lake County's director of probation, taken in preparation for the post-conviction petition of Reynaldo Rondon, in which the director testifies that Rondon's completed questionnaire was given only to Judge Letsinger, and that copies were not routinely given to defense counsel. (Petitioner's Supp. Br. at A–25.) While Judge Letsinger acknowledges that he reviewed Matheney's completed questionnaire, he believes that he did not rely on it when determining the appropriate sentence for Matheney. (*Id.* at A–53.)

 Matheney makes five arguments about this questionnaire. First, he claims that failure to submit the completed questionnaire to Matheney's trial counsel violated Matheney's due process rights as articulated in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality) (remanding for a new sentencing hearing a death sentence that was based, in part, on information not disclosed by court to defense counsel prior to the sentencing hearing). Second, he claims this failure also violated his right to be free from cruel and unusual punishment under Article One, Section 16, of Indiana's constitution. Third, he claims that this failure violated Indiana Code § 35–38–1–12, which requires the sentencing court to advise the defendant or counsel of the factual contents and the conclusions of the presentence investigation. Fourth, he claims that the trial court's review of "secret information" in its sentencing prevented meaningful appellate review of Matheney's death sentence. Finally, Matheney claims that any decision by this Court other than vacating Matheney's death sentence would violate his rights under the U.S. and Indiana Constitutions because this Court's investigation of this issue "has not developed the facts sufficiently for Matheney to substantiate his claim that his death sentence is based, at least in part, on information Matheney had no opportunity to explain." (Petitioner's Supp. Br. at 16–17.)

All of Matheney's claims share one common premise. They do not allege a violation of Matheney's rights by the administration of the questionnaire, per se. Rather, Matheney's various claims all rise or fall based upon the allegation that Matheney did not have the opportunity to contest information which may have influenced the judge in his sentencing decision, because Matheney was not given this information by the judge.

The Indiana Code does provide that defendants receive the products of the presentence investigation. We find this particular product, the Letsinger questionnaire, an unimpressive one. As interpreted by persons trained in its use, a completed MMPI might have some value in making certain sentencing decisions.

Rather than remand this case to the post-conviction court so it can delve into a factual and legal morass involving a three-page questionnaire the trial judge says played no role in sentencing, we will independently review the proper aggravating and mitigating circumstances absent the psychological questionnaire at issue and determine whether the death sentence in this case is appropriate, *Lambert v. State,* 675 N.E.2d 1060, 1065 (Ind. 1996), thereby making the claims surrounding this psychological questionnaire moot.

 The charged aggravating circumstances were killing by "lying in wait," and killing while committing or attempting to commit burglary. As fully discussed in our previous opinion, there was abundant evidence proving this aggravator beyond a reasonable doubt. *Matheney v. State,* 583 N.E.2d 1202, 1208–09 (Ind.1992). There is also ample evidence showing that Matheney broke into Bianco's home with the intent to commit murder therein. The "breaking" aspect is irrefutable: the evidence showed that he broke through the backdoor to gain entry into the house. The evidence indicating that he intended to commit murder after breaking in is also strong: he had repeatedly expressed an intention to kill Bianco and had tried to solicit others to do so; he went straight to Bianco's Mishawaka home, instead of to Indianapolis, on his eight-hour pass from the Pendleton correctional facility, stopping only at his mother's home to drop her off and at Rob Snider's home to change his clothes and get one of Snider's shotguns;

and he pursued Bianco with the gun in hand as she ran from her home dressed only in her underpants, striking her repeatedly upon catching her until the gun shattered from the force of the blows. Few things short of fear of imminent death would drive the average female out of her urban home across the street and over to the house of a neighbor in the middle of the day dressed only in her underpants.

The evidence also suggests some arguably mitigating circumstances. First, the defendant was extremely angry with the victim, which could be evidence that he was under the influence of an extreme mental or emotional disturbance when he killed Bianco. Ind.Code Ann. § 35–50–2–9(c)(2) (West Supp.1996). However, as Judge Letsinger noted, there was also evidence tending to show that his anger did not rise to the level that it dominated his actions.

> The video tape after his arrest that day shows a calm demeanor with Matheney discussing the case disposition just after the fact. This attitude is entirely consistent with the witness description of his calm demeanor before the fact. He had given no one any indication of emotions out of control. These witnesses had known and observed his behavior from birth.

(Petitioner's Br. at A–1—A–2.) Thus, we can only afford this mitigator slight weight.

Second, while evidence was offered supporting the contention that Matheney suffered from a mental disease which caused him to view life through a distorted and deluded version of reality, (see, e.g., T.R. at 2724–32), there was little evidence tending to show that this alleged mental disease left Matheney literally no other choice but that of killing Lisa Bianco. While it may have caused him to believe that Bianco and others were conspiring to keep him incarcerated and deprive him of his rights, we are still left with the question of why that belief would necessarily drive Matheney to kill Bianco instead of simply sticking to legal, lawful avenues of exposing this perceived unlawful conspiracy. While hate, jealousy and vengeance may be motivations which are undesirable and often lead people to do things they otherwise would not do, we do not consider people who act upon these motivations to be "mentally ill" or unable to "conform their conduct to the requirements of the law," per se. Moreover, other evidence before the trial court supported its finding that this mitigating circumstance was not present. See supra note 13. Thus there is little if any weight for this mitigator available to effect the significant weight of the two proven aggravators.

Finally, we note that the jury fully considered the aggravators and mitigators and recommended the death sentence upon concluding that latter outweighed by the former, Matheney, 583 N.E.2d 1202, 1209 (Ind.1992), and did so without the aid of the psychological questionnaire at issue. Our reweighing of the statutory aggravators and mitigators, also without consideration of the contents of Judge Letsinger's psychological questionnaire, amply demonstrates that the aggravating circumstances outweighed the mitigating circumstances and that death is appropriate for this offense and this offender.

### Conclusion

We affirm the judgment of the post-conviction court.

DICKSON, SULLIVAN and SELBY, JJ., concur.

BOEHM, J., concurs with separate opinion.

BOEHM, Justice, concurring.

For the reasons stated in my dissent in Lambert v. State, 675 N.E.2d 1060 (Ind. 1996), I believe that a procedurally defective sentencing order in a death penalty case should require remand for resentencing. Based on this record I cannot conclude that the sentencing decisions of the court were unaffected by the questionnaire described in the court's majority opinion. It appears more probable than not that the questionnaire was never communicated to the parties. In a matter as sensitive as a death penalty proceeding, the greatest care must be taken to afford all parties the opportunity to present their issues in a full and fair proceeding. The slightest ex parte communication runs the risk of tainting the proceeding. Howev-

er, I do not believe I should refrain from participation in the reweighing exercise directed by the majority on the ground that I would not have designed the process to include it. For that reason I concur in all portions of the opinion, except as to part III, and concur in result as to part III.

Having explained this position, I do not expect to find it necessary to reiterate it in future cases in the unhappy but foreseeable circumstance that the same issue presents itself again.