**Debra Denise BROWN, Appellant (Defendant below),**

v.

**STATE of Indiana, Appellee (Plaintiff below).**

No. 45S00–9212–PD–939.

Supreme Court of Indiana.

July 17, 1998.

Rehearing Denied Nov. 20, 1998.

Susan K. Carpenter, Public Defender, Indianapolis, Ken Murray, Columbus, OH, Janet S. Dowling, Evans, Dowling & Youngcourt, P.C., Indianapolis, for Appellant.

Jeffrey A. Modisett, Attorney General, Christopher L. LaFuse, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

Petitioner Debra Denise Brown appeals the denial of post-conviction relief with re-

spect to her convictions for Murder[1] and Attempted Murder,[2] and her sentence of death.[3] We earlier affirmed these convictions and this sentence on direct appeal. *Brown v. State,* 577 N.E.2d 221 (Ind.1991), *reh'g denied,* 583 N.E.2d 125, *cert. denied,* 506 U.S. 833, 113 S.Ct. 101, 121 L.Ed.2d 61 (1992). We now affirm the denial of post-conviction relief.

### Background

Debra Denise Brown and her companion, one Alton Coleman, were convicted and sentenced to death in separate proceedings for stomping a seven-year old girl to death and attempting to choke a nine-year old girl to death with a belt after sexually assaulting the latter. These crimes were part of a crime spree which also took Brown and Coleman to Ohio, Michigan and Illinois. About a month after the Indiana crimes were committed, Brown was apprehended in Illinois and turned over to the FBI, which had been actively engaged in the investigation.

Our discussion *infra* and our opinions on Brown's and Coleman's direct appeals contain additional details of their crimes, trials, and claims for relief. *See Brown,* 577 N.E.2d at 224–25; *Coleman v. State,* 558 N.E.2d 1059, 1060–61 (Ind.1990), *cert. denied,* 501 U.S. 1259, 111 S.Ct. 2912, 115 L.Ed.2d 1075 (1991).

### Discussion

### I

Brown contends that she is entitled to post-conviction relief because the State violated its obligation to disclose material exculpatory evidence by failing to disclose prior to her trial certain psychological profiles and related materials compiled by the FBI. As noted in *Background, supra,* Brown and Coleman had been interstate fugitives. As such, the FBI prepared a psychological profile and related material on Brown to assist in her capture. During preparation for Brown's trial, Indiana authorities had in their possession a substantial volume of FBI materials. When the FBI sought to have these materials returned, Brown's trial counsel protested, contending that he had not yet had time to review all of the materials. Upon a representation from the State that the files contained no exculpatory material, the trial judge permitted the materials to be returned to the FBI.

In preparation for post-conviction proceedings, Brown obtained four documents in the possession of the FBI which she contends are exculpatory. Brown is, of course, correct that the State has an affirmative duty to disclose evidence favorable to a criminal defendant. *Kyles v. Whitley,* 514 U.S. 419, 432, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)). Brown raises several interesting questions as to whether the State had a pre-trial obligation to disclose these four documents. However, an allegation of a *Brady* violation requires a demonstration that the undisclosed favorable evidence "could be reasonably taken to put the whole case in such a different light as to undermine confidence" in the trial court's judgment. *Kyles,* 514 U.S. at 435, 115 S.Ct. 1555. We elect to proceed to that inquiry first. Because we find that these four documents could not be reasonably taken to put the whole case in such a different light as to undermine confidence in the trial court's judgment, we hold that Brown is not entitled to post-conviction relief on this contention.[4]

1. Ind.Code § 35–42–1–1 (1982).

2. Ind.Code §§ 35–41–5–1 & 35–41–1–1 (1982).

3. Ind.Code § 35–50–2–9 (Supp.1983). Unless otherwise indicated, references to Ind.Code § 35–50–2–9 refer to the version published in the 1983 Supplement to the Indiana Code, the death penalty statute in effect at the time the crimes at issue were committed.

4. Following oral argument in this case, Brown filed a motion seeking "judgment on the arguments and concessions of the State." She contends that certain statements made by the deputy attorney general arguing the case concerning the FBI material "effectively conceded error of constitutional magnitude." Appellant's Verified Motion for Judgment on the Arguments and Concessions of the State (July 25, 1997). To the extent the State made any concessions in this regard, the State most assuredly did not concede that the FBI documents introduced at the post-conviction proceeding "could be reasonably taken to put the whole case in such a different light as to undermine confidence" in the trial court's judgment. *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct.

### A

We note first that while Brown seeks to have both her convictions and her sentence reversed on the basis of this claim, she makes no specific argument as to how these four documents undermine confidence in the jury's guilty verdicts. Rather, her specific claims are that these documents contain important evidence of her psychological domination and control by Coleman, mitigating circumstances which should have been considered by the jury during the penalty phase.

Certainly the subject matter of these four documents comprise mitigating circumstances appropriate for consideration in a death penalty case. Our death penalty statute specifically itemizes the domination and control of another person as a mitigating circumstance.[5] Acting under the influence of an extreme emotional disturbance is another statutory mitigating circumstance.[6] And the mental health of the defendant is frequently considered as a mitigating circumstance under the "catch-all" mitigator.[7] These four documents implicate each of these circumstances.

The first FBI document, Brown's Exhibit 31, states in pertinent part:

Coleman has a violent temper, and when he is upset he is uncontrollable. * * * Ever since Coleman's mother died of cancer, Coleman seems to have gone off his rocker. * * * Debra Denise Brown has lived with Coleman and his blind grandmother for the past two years. Brown has lost about 35 pounds during this time. She has been virtually a prisoner in the house. If she left without Coleman, he would beat her. During [an] interview with FBI agents, Brown was very docile. She admitted that scars and scratches on

her face were from Coleman. It is believed that she is completely under the control of Coleman.

(R. at 1894–96.)[8] The second and third FBI documents, Brown's Exhibits 32 and 33, contain essentially the same information. (R. at 1898; 1902.) The fourth FBI document, Brown's Exhibit 36, is an extensive report prepared by the FBI regarding her background, including an interview with Lottie Mae Brown, Brown's mother. The report indicates that:

1. Brown's father had severe mental problems, drank to excess, and physically abused family members including the children.

2. Brown had experienced a drug overdose which required hospitalization in 1980 and may have been using drugs regularly.

3. Brown's personality changed drastically after she met Coleman.

4. Brown moved in with Coleman and would not talk to her family, but would look to Coleman to answer for her.

5. Brown's mother felt that Coleman completely controlled Brown and that she would do whatever Coleman asked her to do; Brown's mother also believed that Coleman was beating Brown and using her as a prostitute.

6. Brown's mother had seen Brown with her face "all beaten up" during the time Brown was living with Coleman.

(R. at 1931.)

### B

From the very outset of the penalty phase, defense counsel made it clear that his princi-

---

1555, 131 L.Ed.2d 490 (1995). Appellant's motion is denied.

For many years in capital cases, this Court has greatly appreciated and valued the willingness of the State to acknowledge the legitimacy of contentions made by criminal defendants and weaknesses in its own cases. Brown's attempt to turn into an admission of constitutional error the State's longstanding policy of forthright and candid discussion of the issues is not well taken.

5. Ind.Code § 35–50–2–9(c)(5) ("The mitigating circumstances that may be considered under this section are as follows: ... The defendant acted under the substantial domination of another person.").

6. Ind.Code § 35–50–2–9(c)(2) ("The mitigating circumstances that may be considered under this section are as follows: ... The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.").

7. Ind.Code § 35–50–2–9(c)(7) ("The mitigating circumstances that may be considered under this section are as follows: ... Any other circumstances appropriate for consideration.").

8. Citations to the record of post-conviction proceedings are denominated as "R."; to the trial record as "T.R."

pal argument would be that Brown should not be sentenced to death because she had been acting "under the substantial domination of Alton Coleman." (T.R. at 3344.) In a powerful fourteen page opening statement to the jury at the beginning of the penalty phase, defense counsel spent thirteen pages of it emphasizing Coleman's control over Brown. (T.R. at 3385–3400.) Specific testimony to this effect was presented by defense counsel throughout the penalty phase.

Counsel proceeded to make his argument primarily through expert testimony. First, a Dr. Batacan, a psychiatrist who had examined Coleman, testified as to Coleman's manipulative personality. Then a Dr. Periolet, another psychiatrist who had examined Coleman, testified that one characteristic of Coleman's sociopathic personality was that he would assess who he could control. Counsel then called a Beverly Perkins, Coleman's ex-wife, who testified that Coleman used physical violence and threats of harm to her family whenever she tried to leave their apartment to do something by herself.

Next counsel called a Dr. Kelly, a psychiatrist, who testified as to the results of his examination of Brown. Dr. Kelly had examined Brown twice and also discussed the results of his examination with a psychologist, Dr. Rogers, who had independently examined her. In compiling the results of his examination, Dr. Kelly also examined additional hospital records, school records and the report of another psychologist, Dr. Suran, concerning Brown. Dr. Kelly testified as to Brown's difficult upbringing, based on his conversation with members of her family, including her mother and sister. He discussed her poor school record, a serious auto accident in which she had been involved, and her record of truancy from school. He noted that her school records showed an IQ at the age of 12 of 59 and a current IQ of 74.

In Dr. Kelly's expert opinion, Brown suffered from the mental illness of dependent personality disorder. Among the causes of the dependent personality disorder identified by Dr. Kelly were her limited intelligence and difficult family upbringing. Dr. Kelly also gave his expert opinion that Brown was under the domination and control of Coleman at the time of the crime and that she was a good candidate for rehabilitation.

Defense counsel also called a Dr. Suran, a clinical psychologist, who had conducted a diagnostic psychological evaluation of Brown, including a social history. Dr. Suran reported that Brown scored 75 on the Wechsler IQ test and that she functioned as mildly retarded. His examination showed her to have "a very depraved background" and that she never evolved to the level of emotional development consistent with her age. More specifically, in his interview with her dealing with her family and background, he learned that she had been the subject of "frequent and repeated physical abuse, sexual abuse, and a very strong sense of rejection and abandonment." Dr. Suran found Brown to be the victim of severe environmental deprivation.

It was Dr. Suran's expert opinion that Brown suffered from borderline retardation, depression, and had a dependent personality or passive dependent personality. Dr. Suran also made reference to Brown's childhood abuse, collected school and medical records, and noted her childhood mental retardation diagnosis.

Two statements from Dr. Suran's testimony bear citation here:

> [I]ndependent of her relationship with Alton Coleman, I really find no evidence in Debra's personality or functioning of tendencies to commit the kinds of offenses for which she has been convicted, and it is my conclusion that it is only in and through her relationship with Alton Coleman that she has had any involvement in these crimes.

(T.R. at 3746–47). Further:

> I do not find in Debra Brown the kind of impulse type of hostile, aggressive, resolved or unresolved, instincts and impulses that is capable of committing the kinds of offenses for which she has been convicted. What I do find is a pathological degree of dependent behavior on her part that through association with another agent that was capable and that did have such hostile impulses that she would act out those impulses dependently serving the

other agent, in this case, the agent being Alton Coleman.

(T.R. at 3757.)

The trial court gave reasonably extensive treatment to this evidence in its sentencing order:

There is a large quantity of evidence from the reports and testimony of a clinical psychologist who examined defendant Brown on April 18, 1986 and testified at trial and the report of a psychiatrist who examined Deborah [sic] Brown on August 1 and August 8, 1984, and testified at trial and other psychological reports that the Defendant was under the substantial domination of her co-defendant at the time these offenses were committed. The Court has already detailed the Defendant's mental state at the time of the commission of these offenses. It is agreed by the experts that the Defendant was a young woman with borderline intellectual functioning with a dependent personality disorder. It is further agreed that she had demonstrated an inability to function independently and to assume responsibility for major areas of her life. It is evident from her interview with Dr. Suran that Alton Coleman provided her with attention and support and that he is someone that this defendant became devoted to. Further evidence was presented of the dominant, manipulative personality of Alton Coleman. Truly he is such a person and appears to be totally without conscience. The affect of such a person on one with Deborah [sic] Brown's inadequacies is also obvious. The central question to this Court is whether or not Deborah [sic] Brown was so under the domination of Alton Coleman because of her own inadequacies and personality disorders that she could not make a rational choice as to her own participation in repeated violent criminal acts, accompanied by repeated efforts to deceive intended victims and others and to evade prosecution. Defendant Brown was not and is not insane nor mentally ill. She was not under the influence of alcohol or drugs. In the

opinion of this Court she made a choice to follow Coleman and to prove herself to him. She stated to Dr. Suran "I know I have to suffer for what I did, but I'll give my life for him. I'll fight for my husband's (Coleman) life. I'll go down for him. I'll put my life on the roll for him ... I loved him so much, I told him that I would go down with him, and I would give up my life for him." The Court would agree that defendant Brown reached her decision making processes in this crime spree with limited intellectual tools. But the Defendant made a rational decision to become involved with Coleman no matter what the consequences, including these horrible crimes committed against innocent children and many others including at least two other vicious murders. The domination over this defendant by Alton Coleman is not sufficient to excuse her criminal conduct.

(T.R. at 355–57.)

It is true that at the post-conviction hearing, both trial counsel and the experts who testified at trial indicated that they would have been able to make their case that Brown was under Coleman's domination and control more persuasively had they known what was in the four FBI documents. The post conviction court disagreed, finding that these materials did not add anything to the evidence which was presented to the jury. We find no basis to disagree with this conclusion.[9] While the FBI reports contained information relevant to mitigating circumstances appropriate for consideration in the penalty phase of Brown's trial, trial counsel in fact argued those mitigating circumstances vigorously with the help of expert testimony and the trial court clearly took them into account in pronouncing sentence.

## C

■ In a related argument, Brown contends that the FBI wrongfully denied her access to a substantial quantity of documents

---

9. The post-conviction court also concluded that this evidence did not constitute exculpatory evidence and that there was no evidence before it that established that the information in question was ever in the possession of the State. We find it unnecessary to address these findings.

concerning her case.[10] She argues that this denial has prevented her from fully and adequately investigating, preparing and presenting her claim for post-conviction relief. She further asserts that as a result certain federal and state constitutional rights have been violated.

Brown has not presented us with any basis for concluding that her ability to assert entitlement to post-conviction relief has been limited in any material way or that any of her constitutional rights have been violated as a result. Brown's claim appears to be that there might be additional information in the FBI files of the character discussed in part I–A, *supra, i.e.*, information showing that she was under the domination and control of Coleman. But as we have already discussed, extensive evidence in support of this mitigating circumstance was presented to the jury and the court during the guilt and penalty phases of Brown's trial. Nothing in Brown's argument gives us any basis for concluding that any undisclosed information "could be reasonably taken to put the whole case in such a different light as to undermine confidence" in the trial court's judgment, *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555.

 Brown's principal argument here seems to be along the lines that there might have been additional evidence in the FBI files supporting her claim of domination and control by Coleman. But she also suggests entitlement to the FBI files "to learn what, if any, additional exculpatory information is hidden in the FBI files and to pursue whatever leads might be uncovered." Br. of Appellant at 121. We have recently observed that the post-conviction relief process "is not a device for investigating possible claims, but a means for vindicating actual claims" and that "[t]here is no postconviction right to 'fish' through official files for belated grounds of attack on the judgment or to confirm mere speculation or hope that a basis for collateral relief may exist." *Roche v. State*, 690 N.E.2d 1115, 1132 (Ind.1997), *reh'g denied* (quoting *People v. Gonzalez*, 51 Cal.3d 1179, 275 Cal.

Rptr. 729, 800 P.2d 1159, 1206 (1990)). To the extent that Brown does not contend that there is any specific information in the FBI files that supports her claims to post-conviction relief, no rule of constitutional law or state procedure mandates unfettered access to the FBI files in the hopes of uncovering such. *See Roche*, 690 N.E.2d at 1133 (citing *State v. Marshall*, 148 N.J. 89, 690 A.2d 1 (1997)).

## II

Brown contends that she was denied the effective assistance of counsel to which she was entitled at the penalty phase of her trial because her lawyers failed fully to investigate, develop and present evidence at the penalty phase of her trial. We analyze such claims according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See e.g., Canaan v. State*, 683 N.E.2d 227, 229 (Ind.1997), *reh'g denied, cert. denied*, —— U.S. ——, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998); *Lowery v. State*, 640 N.E.2d 1031, 1041 (Ind.1994). First, we require the defendant or petitioner to show that, in light of all the circumstances, the *identified acts or wrongs of counsel* were outside the range of professionally competent assistance. *Id.* This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Id.* (citing *Turner v. State*, 580 N.E.2d 665, 668 (Ind.1991)). "Isolated poor strategy, bad tactics, a mistake, carelessness or inexperience do not necessarily amount to ineffective assistance of counsel unless, taken as a whole, the defense was inadequate." *Davis v. State*, 675 N.E.2d 1097, 1100 (Ind. 1996) (quoting *Terry v. State*, 465 N.E.2d 1085, 1089 (Ind.1984)). Second, we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived defendant or peti-

---

**10.** Brown represented to us that she pursued, in a timely manner, all available agency and administrative appeals and that these appeals were denied. Appellant's Verified Motion to Compensate and Authorize Counsel to Pursue Necessary Collateral Litigation (Dec. 20, 1996). She then sought a mandate from this court for funds to litigate a Freedom of Information Act claim against the FBI in federal court. We denied this request by Order dated January 6, 1997.

tioner of a fair trial. *Lowery*, 640 N.E.2d at 1041. *See Games v. State*, 690 N.E.2d 211, 213 (Ind.1997). We will conclude that a fair trial has been denied when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unreliable. *Lowery*, 640 N.E.2d at 1041 (citing *Best v. State*, 566 N.E.2d 1027, 1031 (Ind.1991)).

## A

Brown's claim of failure fully to investigate, develop and present penalty phase evidence focuses on four areas: (1) her family and upbringing; (2) her intellectual and educational deficits; (3) her absence of any criminal record or history of violence, and her generally positive character, prior to meeting Alton Coleman; and (4) she was suffering from Battered Women's Syndrome.

■ At the post-conviction hearing, Brown presented extensive evidence in each of these areas.[11] Nevertheless, the post-conviction court found that she had not been denied the effective assistance of counsel in this regard because prejudice had not been shown. The post-conviction court concluded that given the seriousness of the crimes for which Brown had been convicted, the jury was unlikely to reach a different result even with this evidence.

Without reaching the issue of prejudice, we agree with the post-conviction court's conclusion because we do not find counsel's performance to have been deficient. As discussed in part I, *supra*, counsel's strategy at the penalty phase was to argue that Brown should not be sentenced to death because she had been acting "under the substantial domination of Alton Coleman" when she committed the crimes for which she had been convicted. In part I–B, *supra*, we detailed the testimony elicited by defense counsel at the penalty phase. That recitation demonstrates that counsel did present to the jury at the penalty phase of Brown's trial evidence of her difficult family upbringing, her limited educational and intellectual abilities, her positive record of behavior prior to meeting Alton Coleman and, if not that she was explicitly the victim of Battered Women's Syndrome, that she functionally suffered from it at Coleman's hands.[12] It appears to us that Brown's quarrel with her trial counsel is over the amount of evidence presented in these three areas at trial, not whether any investigation, development or presentation took place.[13]

On this record, we cannot say that counsel's performance was deficient in concentrating his penalty phase argument on Brown's relationship with Coleman. To be more specific, we cannot say that it was deficient performance for counsel to marshal his witnesses to try to present as strong a case as possible that Brown committed the crimes for which she had been convicted under the domination and control of Coleman and that her submission to his domination and control was accounted for by her difficult upbringing, her limited IQ and her mental illness of dependent personality disorder. Brown has not demonstrated deficient performance by her trial counsel in this regard.

## B

In a related claim, Brown contends that the post-conviction court improperly excluded evidence relevant to her claim that trial counsel was ineffective for failing fully to investigate, develop and present mitigating evidence. She argues that the exclusion of this evidence denied her a full and fair post-conviction hearing. According to Brown, the excluded evidence consisted of the following four items:

---

11. The post-conviction court excluded some of this evidence. Brown's claim of error in this regard is discussed in part II–B, *infra*.

12. While Brown asserts that she was the victim of Battered Women's Syndrome in her post-conviction appeal brief, she points us to no evidence presented to the post-conviction court that actually uses the term "Battered Women's Syndrome."

13. We note in this regard Brown's use of the adverb "fully" to describe counsel's alleged deficient performance, *e.g.*, "Trial counsel's failure to *fully* investigate, develop and present penalty phase evidence denied Brown the effective assistance of counsel." Br. of Appellant at 51 (emphasis supplied).

1. The testimony of a Mr. See, a Cleveland-based executive of an offender reentry program with experience as a witness concerning mitigating circumstances, which was "offered to show the social, racial and cultural environment in which Brown was raised and to demonstrate how the individuals and social service institutions charged with [Brown's] care defaulted on their responsibilities." Br. of Appellant at 93. While See's testimony is of record, the post-conviction court ultimately excluded it. (R. at 1637–38.)

2. Certain unspecified affidavits relevant to the claim of failure to investigate and discover mitigating evidence. Br. of Appellant at 98. These affidavits appear to be of the same nature as those discussed in part III–A of our recent opinion in *Roche*, 690 N.E.2d at 1131. They are included in the record but were "not admitted." (R. at 98.)

3. The post-conviction testimony of Dr. Suran to "the effect of the recently discovered mitigating evidence on the conclusions he described at trial." Br. of Appellant at 99. The record contains a filing styled "Proffer of Testimony of Bernard Suran, Ph.D.," summarizing the testimony he would have given. (R. at 506–08.)

4. A "social history report" prepared by a Mr. Coconis, a social worker with experience as an investigator of mitigating circumstances, which was to have been used as the basis of Dr. Suran's testimony. Br. of Appellant at 101. Although the State's objection to the introduction of this report was sustained, a copy is included in the record. (R. at 1908–17.)

5. The post-conviction testimony of Brown's trial counsel, Mr. Toomey, as to whether he thought and felt he gave Brown effective representation at trial. Br. of Appellant at 102. The post-conviction court sustained the State's objection on grounds that the question

of counsel's effectiveness was for the court to decide. (R. at 1430.)

██ We find no error with respect to item (2), the exclusion of the affidavits. *See Roche*, 690 N.E.2d at 1131 (affidavits prepared for similar purpose excluded). We also find no error with respect to item (5), the prohibition on counsel's testifying as to his own ineffectiveness. *Compare* Ind.Evidence Rule 704(a) (testimony is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact) and Evid.R. 704(b) (witnesses may not testify to opinions concerning legal conclusions).

██ Items (1), (3) and (4) all relate to Brown's family and upbringing, her intellectual and emotional development, her lack of criminal history before meeting Alton Coleman, and her relationship with Coleman. The post-conviction court generally excluded this information on grounds that, even if it had been presented to the jury during the penalty phase of Brown's trial, it "would not have made a difference to the jury's recommendation or the trial court's sentence." [14] (R. at 778.) As such, the post-conviction court concluded, the prejudice prong of the test for ineffective assistance of counsel had not been satisfied.

We are not as willing as the post-conviction court to imply that there are circumstances in which no quantum of evidence would be sufficient to change a jury's recommendation or a trial court's sentence. But, as noted at the outset of part II–A, *supra*, we find it unnecessary to analyze this issue in terms of prejudice. Our purpose here is not to replay Brown's trial; it is to determine whether she was denied the effective assistance of counsel to which she was entitled. We concluded *supra* that counsel did not render deficient performance with respect to the presentation of mitigating circumstances. The fact, without more, that the additional evidence excluded by the post-conviction court could have been presented at trial does not affect this conclusion.

**14.** As Brown points out, there is language in the post-conviction court's findings and conclusions that suggests that although the post-conviction court announced during the proceedings that the additional evidence of mitigating circumstances was being excluded, the court did take it into account in its findings. See Br. of Appellant at 92.

## III

Brown contends that she was denied the effective assistance of counsel to which she was entitled when counsel failed to present evidence of Brown's borderline mental retardation in support of his contention that Brown's confession had been involuntary. Noting that this Court gave extensive consideration to the voluntariness of Brown's confession in her direct appeal, *Brown*, 577 N.E.2d at 229, the State argues that the issue is not available for relitigation here. *See* Ind.Post–Conviction Rule 1(8); *Canaan*, 683 N.E.2d at 235; *Lamb v. State*, 511 N.E.2d 444, 447 (Ind.1987); *Ingram v. State*, 508 N.E.2d 805, 807 (Ind.1987).

■ We agree with the State's argument that the doctrine of *res judicata* bars consideration of Brown's argument here. Brown's argument is essentially this: (1) her borderline retardation and mental illness (severe passive-dependent personality disorder) impacted her ability to make a knowing, voluntary and intelligent waiver of her constitutional rights in giving her confession; (2) her lawyer was unaware of case law that holds that evidence of mental retardation is relevant and material to determining whether or not a defendant knowingly and voluntarily waived his or her rights; and (3) counsel's failure to know the law effectively precluded the suppression of Brown's confession. As the phrasing of her argument suggests, a defendant's limited intelligence or mental health alone does not render a confession involuntary. Indeed, in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court said that the purpose of the Fifth Amendment's testimonial privilege against self-incrimination and the requirements of *Miranda* are to protect against police misconduct. "Although a person's mental condition is relevant to the issue of susceptibility to police coercion, where the person voluntarily makes a confession without police coercion the confession may be considered in spite of the mental condition." *Pettiford v. State*, 619 N.E.2d 925, 928 (Ind.

1993). *See Connelly*, 479 U.S. at 167, 107 S.Ct. 515. Thus the issue here really turns on whether the police conduct was coercive within the meaning of *Connelly*. We decided this issue on direct appeal. *Brown*, 577 N.E.2d at 230 ("no inducements or threats were made by law enforcement officials to gain the confession"). It is not available for relitigation here.

## IV

■ Brown contends that she was denied the effective assistance of appellate counsel to which she was entitled in several respects. As with claims of ineffective assistance of trial counsel, we analyze claims of ineffective assistance of appellate counsel according to the two-part test announced in *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052. *See, e.g., Lowery*, 640 N.E.2d at 1048 ("standard of review for a claim of ineffective assistance of appellate counsel is identical to the standard for trial counsel"). A petitioner claiming ineffective assistance of appellate counsel must show both deficient performance and resulting prejudice. *Roche*, 690 N.E.2d at 1120. The failure to establish either prong will cause the claim to fail. *Id.*

Brown first contends that her appellate counsel (who was the same as trial counsel) was ineffective for failing to raise on direct appeal the issues discussed in parts IV–A and IV–B, *infra*. These were issues, Brown points out, that counsel raised in his motion to correct errors following trial but did not raise on direct appeal.[15] The post-conviction court appears to have concluded that these contentions were tantamount to an argument "that appellate counsel did not pursue a claim in the direct appeal that the trial court judge erred in imposing the death sentence." (R. at 765.) But, the post-conviction court continued, "Because the Supreme Court fulfilled its independent duty to review the propriety of the death sentence and upheld that sentence, that issue is *res judicata.*" *Id.* We find this conclusion too attenuated to affirm without further analysis.

**15.** At the time of Brown's direct appeal, raising an issue in a motion to correct errors was a prerequisite to appellate review.

■ The State points out that in the direct appeal, counsel raised five substantial errors for our review and rightly cites our opinion in *Lowery* to the effect that counsel is not required to raise every possible claim in a direct appeal. As we said in *Lowery*, counsel should exercise professional judgment and expertise in choosing the issues raised on appeal. *Lowery*, 640 N.E.2d at 1049. This comports with the United States Supreme Court pronouncement to the same effect—that effective advocacy does not mandate that the appellate attorney raise each and every non-frivolous issue. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). *See Bieghler v. State*, 690 N.E.2d 188, 194 (Ind.1997) ("the reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made"), *reh'g denied*. *See also Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989) ("One of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects."). Nevertheless we elect here to address the claims on the merits.

### A

One of the mitigating circumstances specified in our death penalty statute is the absence of prior criminal history. During the penalty phase, defense counsel questioned Dr. Suran as to whether Brown had any prior criminal history prior to her association with Coleman. Dr. Suran testified that Brown had no criminal history prior to that time. The crimes Brown committed with Coleman began in June, 1984, with the crimes that are the subject of this proceeding and then continued with additional crimes in Ohio in July of that year. In rebuttal, the State introduced evidence over the objection of Brown's counsel that Brown had been convicted of a kidnaping which occurred after June, 1984. Brown now says, "Defense counsel attempted to establish that Brown had no previous juvenile or adult criminal history prior to her crime spree with Coleman, which began in June, 1984. Admission of a kidnaping conviction which occurred after June, 1984 did not logically tend to rebut the defense evidence. Moreover, admission of [the evidence of the kidnaping conviction] impaired the jury's ability to find the existence of, or give weight to, the [absence of prior criminal history] statutory mitigator." Br. of Appellant at 81.

■ We have never been called upon to address whether evidence of crimes committed after the offense for which the defendant is on trial is admissible in rebuttal of an assertion of absence of prior criminal history on the defendant's behalf. While such evidence is certainly not relevant to determining whether the defendant had a criminal history prior to committing the offense for which he or she is being tried, we nevertheless believe that such evidence is relevant to determining the weight to be given to the no prior criminal history mitigator. *See generally Cozzolino v. State*, 584 S.W.2d 765, 768 (Tenn.1979) (evidence of subsequent crimes admissible in penalty phase only if it is relevant to an aggravating circumstance or a mitigating circumstance raised by the defendant). We further note that two of the aggravating circumstances in this case were murders committed by Coleman and Brown (and reduced to conviction) after the date of the offenses for which she was being tried and Brown has never raised any question as to the propriety of using these later-occurring offenses as aggravating circumstances. If Brown has no objection to using later-occurring offenses as aggravating circumstances to justify the imposition of the death sentence, the argument against the use of a later-occurring offense as rebuttal to a claim of no prior criminal history seems far less compelling. We find the trial court well within its discretion to admit the evidence of the later occurring offense in rebuttal and consequently find no ineffective assistance of appellate counsel for failing to raise the issue on direct appeal.

### B

At the outset of proceedings in the trial court, Brown filed a motion to dismiss the

death penalty count on grounds that the Indiana death penalty statute was unconstitutional. This claim was raised again in the motion to correct errors but not on direct appeal. Brown now argues that appellate counsel was ineffective for failing to claim that the trial court erred by not denying the motion to dismiss. As best as we can understand Brown's argument in this appeal, she contends that the Indiana death penalty statute is unconstitutional for failing to give adequate guidance to the sentencer in two respects: (1) the statute does not provide any standard of proof for finding the existence of mitigating circumstances; and (2) the statute does not provide any guidance as to how the sentencer is to assess the relative weight of any aggravating and mitigating circumstances found to exist.

We recently addressed the first of these claims in *Matheney v. State*, 688 N.E.2d 883, 902 (Ind.1997), *reh'g denied*. Here, Brown argues "This capital sentencing [sic] permits the sentencer to arbitrarily apply any standard of proof to the existence of mitigators it chooses. While the sentencer might apply some low standard of proof to mitigating circumstances, it is equally likely that the sentencer might apply a standard of proof which is higher than contemplated, possibly higher than proof beyond a reasonable doubt. Furthermore, the sentencer is free to apply a completely subjective standard of proof to mitigating circumstances which effectively bars the consideration of both statutory and non-statutory mitigating circumstances." But in *Matheney* we said, "Without something specific in the given jury instructions which would clearly lead a jury to such a misunderstanding, a bald assertion as to what a jury is likely to presume will not suffice." *Matheney*, 688 N.E.2d at 902. Brown's argument is even weaker than Matheney's because the record reveals that the trial court instructed Brown's jury, "A circumstance need not be proved, beyond a reasonable doubt, to be considered a mitigating circumstance by you." (T.R. at 290.).

As to the second contention, we resolved the question of whether our death penalty statute provides adequate guidance to the sentencer on the assessment of the relative weight to aggravating and mitigating circumstances adverse to Brown's position in *Miller v. State*, 623 N.E.2d 403, 408–09 (Ind.1993) (citing *Fleenor v. State*, 514 N.E.2d 80 (Ind. 1987))

### C

Brown contends that appellate counsel was ineffective for failing to claim on direct appeal that the Indiana death penalty statute was unconstitutional as applied to Brown in this case because it failed to narrow the class of persons eligible for capital punishment. Specifically, she argues that the first aggravating circumstance alleged by the State in support of its death penalty request, that Brown intentionally killed while committing child molesting, duplicated the elements of the underlying murder and child molesting charges. She begins by observing that the United States Supreme Court held in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), to the effect that a legislature may achieve the constitutionally required narrowing either by defining certain murders as capital offenses or by requiring findings of aggravating circumstances at the penalty phase. Noting that Indiana has chosen the later approach, she contends that in her situation no narrowing occurred because the aggravating circumstance charged was no different than the underlying offenses with which she was charged. As the State properly points out, this court has previously held that such a contention misconstrues the narrowing function of our death penalty statute:

> Appellant ... claims that the overlap between the aggravating circumstance found at the sentencing phase and the convictions at the guilt phase violates constitutional principles by eliminating the critical narrowing function of the sentencing process, allowing the State to enter the penalty phase with the aggravating circumstance already proven beyond a reasonable doubt. Our death penalty statute requires the sentencer to find at least one aggravating circumstance beyond a reasonable doubt, to consider and evaluate any mitigating factor it may find to exist, and to weigh the aggravators and mitigators, finding that the mitigating circumstances are out-

weighed by the aggravating circumstances, before it may impose death. This scheme adequately structures and channels the discretion of the jury and the court and satisfies the ruling in *Lowenfield v. Phelps[.]*

*Baird v. State,* 604 N.E.2d 1170, 1183 (Ind. 1992).

### D

■■■■ Brown contends that appellate counsel was ineffective for failing to raise three claims of trial court error in instructing the jury.[16] Brown's assertions of ineffective assistance of counsel are conclusory in nature and not supported by any argument or authority as to deficient performance. We find such claims waived for failure to comply with Ind.Appellate Rule 8.3(A)(7) (requiring an appellant's brief to set forth "the contentions of the appellant with respect to the issues presented, reasons in support of the contentions along with citations to authorities, statutes, and parts of the record relied upon").

### V

■■■ Brown contends that the operation of the Lake County public defender system created a conflict of interest for her trial counsel, denying her the effective assistance of counsel. The conflict alleged appears to be that counsel's loyalty to Brown was compromised by his loyalty to the trial court judge who, under the Lake County scheme, appointed him. Brown also argues that Lake County public defenders were provided insufficient resources by the judges.

Brown's claim is similar to—though less developed than—several claims recently rejected by this court. *See Johnson v. State,* 693 N.E.2d 941, 952 (Ind.1998) (alleging systemic deficiencies in the Madison County

public defender system), *reh'g denied;* *Roche,* 690 N.E.2d at 1135 (Lake County); *Games v. State,* 684 N.E.2d 466, 478–80 (Ind. 1997) (Marion County), *reh'g granted on other grounds,* 690 N.E.2d 211. We reach the same conclusion here. First, absent authority or cogent argument from Brown, we decline to find that any conflict of interest that might exist as a result of a trial judge appointing the public defender in his or her court rises to the level of constitutional violation.[17] Second, irrespective of whether there were problems with the Lake County public defender system, Brown must show that her trial counsel provided deficient performance and that it was prejudicial. *Johnson,* 693 N.E.2d at 953. Brown has shown neither deficient performance nor prejudice.

### Conclusion

We affirm the denial of post-conviction relief with respect to Debra Denise Brown's convictions for Murder and Attempted Murder and sentence of death.

SHEPARD, C.J., and DICKSON, SELBY and BOEHM, JJ., concur.

---

16. Brown also challenges these and an additional instruction as erroneous. Claims of trial court error in instructing the jury not raised on direct appeal are not available for post-conviction review unless the failure to raise them was the result of ineffective assistance of counsel or, perhaps, unless they constituted fundamental error. Although Brown refers to these instructions as "fundamentally erroneous" in the caption to the relevant section of her brief, the narrative portion of that section makes no effort to demonstrate fundamental error. We find such claims, even if available under the fundamental error doctrine, waived for failure to comply with Ind.Appellate Rule 8.3(A)(7).

17. The conflict of interest present in the sole case cited by Brown involved two lawyers jointly engaged to represent three co-defendants at separate trials. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Such a conflict is, of course, very different from the one Brown asserts.